[No. S118032. Apr. 19, 2004.]

JEROME ZAMOS et al., Plaintiffs and Appellants, v.
JAMES T. STROUD et al., Defendants and Respondents.

**COUNSEL**

Jerome Zamos, in pro. per., and for Plaintiffs and Appellants.

James T. Stroud, in pro per., and for Defendants and Respondents.

Milam & Larsen and Paul A. Larsen for Association of California Insurance Companies as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**BROWN, J.**—The question presented by this case is whether, assuming the other elements of the tort are established, an attorney may be held liable for malicious prosecution when he *commences* a lawsuit properly but then *continue*s to prosecute it after learning it is not supported by probable cause.[1] We conclude an attorney may be held liable for continuing to prosecute a lawsuit discovered to lack probable cause.

---

[1] As a convenient shorthand, we will refer to this as *continuing to prosecute a lawsuit discovered to lack probable cause.*

## I. Factual and Procedural Background[2]

The instant case for malicious prosecution is based upon a lawsuit (the fraud lawsuit) brought by Patricia Brookes (Brookes)—who is named as a defendant in this case but is not a party to this appeal—against [Jerome Zamos and Odion L. Okojie (collectively Zamos)]. Zamos had represented Brookes in another lawsuit (the foreclosure lawsuit) arising from the foreclosure on her house. Jerome Zamos and [] Okojie practiced law together. Jerome Zamos was the attorney who primarily represented Brookes in the foreclosure lawsuit, although Okojie made some appearances in that case.

After a jury trial of the foreclosure lawsuit, when it appeared that the jury was deadlocked, Brookes settled the lawsuit against some of the defendants in that case in exchange for $250,000 paid by those settling defendants as damages for emotional distress. Out of that $250,000, Zamos received $83,333.33 as a contingency fee, and Brookes received $166,666.67. As part of the settlement, Brookes expressly released all claims to her house. The terms of the settlement agreement were stated on the record before the court at two separate hearings. Brookes appeared by telephone at the first hearing, held on October 27, 1995, and appeared personally at the second hearing, held on October 30, 1995.

Almost two years later, in 1997, Brookes sued Zamos for fraud, among other claims, based upon certain alleged representations Zamos made to induce her to settle the foreclosure lawsuit. Brookes alleged that Jerome Zamos told her that (1) he would continue to represent her (to judgment) against the nonsettling defendants in the foreclosure lawsuit, (2) he would substitute into and represent Brookes in a malpractice lawsuit Brookes filed against her former attorneys (the malpractice lawsuit), (3) he would have her house returned to her, and (4) he would withdraw from representing her in the foreclosure lawsuit if Brookes did not accept the settlement. Brookes also alleged, among other things, that Mr. Zamos never intended to keep his first three promises and that Zamos withdrew from representing her against the nonsettling defendants, never substituted into the malpractice lawsuit, and never tried to have her house returned to her.

[James T. Stroud, Van T. Do, and their law firm, Stroud & Do (collectively Stroud)] represented Brookes in the fraud lawsuit. In October 1997, shortly

---

[2] We adopt the Court of Appeal's statement of the factual and procedural background. Brackets enclosing material in that part of the opinion (other than citations) denote insertions or additions by this court. Defendants James T. Stroud and Van T. Do petitioned for rehearing, and in their petition objected in certain respects to the Court of Appeal's statement of the facts. (Cal. Rules of Court, rule 28(c)(2).) The petition was denied. In part II.C., we discuss defendants' objections and find they do not undermine the factual conclusions or the judgment of the Court of Appeal.

*after* Brookes's fraud lawsuit was served on Odion Okojie, Zamos sent to Stroud reporter's transcripts of three hearings in the foreclosure lawsuit, which transcripts Zamos contended proved that Brookes's fraud claim had no merit. The first two hearings reflected in the transcripts were those held on October 27, 1995 and October 30, 1995, and the transcripts show that Brookes was told and agreed that she was releasing all claims to her house and that Zamos would not substitute into the malpractice lawsuit. The third hearing, held on January 29, 1996, was a hearing on Zamos's motion to be relieved as counsel in the foreclosure lawsuit. During that hearing, Jerome Zamos explained that he had submitted all of the paperwork necessary for entry of default against the nonsettling defendants, and the trial court explained to Brookes that Zamos would be relieved as counsel and that Brookes would be responsible for bringing the default to judgment. When the trial court asked Brookes whether "there [was] a problem" with relieving Zamos as counsel, Brookes responded, "No, not really." The transcript even shows that Brookes contended that Zamos was never her attorney of record, and she complained that Zamos forced her to come into court for the hearing; she asked the court, "Why couldn't he just send me whatever to be relieved of counsel?" A short time later, Brookes told the court, "I don't care if you sign him off or not. He's never been on."

After Stroud and Brookes refused to dismiss the fraud lawsuit against Zamos despite these transcripts, Zamos moved for summary judgment. In opposition to Zamos's motion for summary judgment, Stroud submitted a declaration signed by Brookes in which Brookes stated, among other things, that she agreed to settle the foreclosure lawsuit in reliance upon Zamos's promises to (1) continue representing her against the nonsettling defendants, (2) represent her in the malpractice lawsuit, and (3) have her house returned to her. The trial court questioned whether Brookes could establish that she was damaged as a result of Zamos's alleged fraud, but the court nonetheless denied Zamos's motion, although it did so "reluctantly," finding that Brookes's declaration raised a triable issue of fact regarding whether Zamos made the alleged promises.

Brookes's fraud lawsuit proceeded to trial before a judge who had not been the judge in any of the other proceedings in that case. Before the trial began, the trial judge informed the parties that he had read the transcripts of the three hearings discussed above in preparation for ruling on several motions. Based on the judge's understanding of Brookes's anticipated testimony, he warned Mr. Stroud several times that he needed to advise Brookes of her Fifth Amendment rights, and that he would notify the district attorney's office if Brookes's testimony at trial contradicted those transcripts because such testimony would be perjurious.

[Carl A.] Taylor and [Nancy M.] Peterson testified at the trial. Apparently (although the record is not entirely clear), Brookes was unable to testify due to health reasons, and Zamos had to put on the defense before the plaintiff's case-in-chief was completed. When Brookes failed to appear after all other witnesses had completed their testimony, Stroud asked for a continuance to allow her an additional opportunity to appear. The trial court denied Stroud's request and granted Zamos's motion for a nonsuit. In granting the motion, the court found that, even if Brookes testified in accordance with the offers of proof that had been made, "no reasonable jury would ever provide a judgment for [Brookes]." In addition, the court found that, based upon the transcripts of the hearings regarding the settlement of the foreclosure lawsuit, Brookes's settlement of that lawsuit "acts as a bar probably in the form of estoppel to [Brookes's fraud lawsuit]."

Following entry of judgment in the fraud lawsuit, Zamos filed the instant malicious prosecution action against Brookes, Stroud, Taylor, and Peterson. Zamos alleged on information and belief that Taylor encouraged Brookes to file the fraud lawsuit against Zamos and engaged Stroud to represent Brookes, and that Peterson urged Brookes to file the fraud lawsuit and gave false testimony to assist Brookes in prosecuting the lawsuit. Zamos also alleged that defendants prosecuted the fraud lawsuit to extort an unwarranted settlement by Zamos.

Stroud, Taylor, and Peterson filed a joint anti-SLAPP[3] motion in which they argued that Zamos could not show a reasonable probability of success on the malicious prosecution claim. Stroud asserted that Zamos cannot show that the fraud lawsuit was brought without probable cause because Stroud's decision to file the action was based upon (1) Brookes's statements regarding Zamos's alleged promises; (2) corroboration by Peterson and, to a lesser degree, by Taylor; and (3) the timing of Zamos's alleged promises, Zamos's receipt of the contingency fee from the settlement, and Zamos's motion to be relieved as counsel in the foreclosure lawsuit. Taylor and Peterson asserted that Zamos [could not] hold them liable for malicious prosecution because their sole involvement with the fraud lawsuit was as witnesses, and thus they [were] protected by the litigation privilege.

In opposition to the anti-SLAPP motion, Zamos presented evidence that shortly after the fraud lawsuit was filed Stroud received the transcripts that Zamos contended gave notice to Stroud that the fraud lawsuit had no merit. Zamos also presented evidence that Taylor sought counsel to represent Brookes in the fraud lawsuit and gave assistance to Stroud during Peterson's

---

[3] [SLAPP stands for *"Strategic Lawsuits Against Public Participation." (Equilon Enterprises, LLC v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57, fn. 1 [124 Cal.Rptr.2d 507, 52 P.3d 685] *(Equilon).*)]

deposition. (Taylor graduated from law school, although apparently he is not a licensed attorney.) Zamos contended that this evidence show[ed] that Taylor was actively involved in maliciously prosecuting the fraud lawsuit. Finally, Zamos presented evidence that Peterson was not present or within hearing distance when Jerome Zamos spoke with Brookes about the settlement agreement in the foreclosure lawsuit, and therefore Peterson is liable for malicious prosecution because her assertion that she heard Mr. Zamos make the alleged promises at issue in the fraud lawsuit was demonstrably false.

The trial court granted the anti-SLAPP motion as to all of the moving parties. As to Stroud, the court found that Stroud had probable cause to bring the lawsuit based upon Brookes's representations that were corroborated by Taylor and Peterson. The court held that Taylor and Peterson were immune from liability under the "common law witness immunity doctrine" set forth in *Briscoe v. LaHue* (1983) 460 U.S. 325 [75 L.Ed.2d 96, 103 S.Ct. 1108] and *Silberg v. Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365]. The court awarded $3,000 in attorney fees to Taylor and $3,000 in attorney fees to Peterson. Zamos timely appealed from the trial court's order dismissing the entire action against Stroud, Taylor, and Peterson and awarding attorney fees.

[The Court of Appeal affirmed the dismissal as to Taylor and Peterson, holding that Zamos failed to meet their burden to demonstrate that their malicious prosecution claim would succeed against Taylor and Peterson. However, the Court of Appeal reversed the dismissal as to Stroud, "hold[ing] that Zamos met his burden with respect to Stroud because [it] conclude[d] that an attorney may be liable for malicious prosecution if the attorney continues to prosecute a lawsuit after discovery of facts showing the lawsuit has no merit."]

[Both plaintiffs Jerome Zamos and Odion Okojie and defendants James Stroud and Van Do petitioned this court for review. Defendants' petition was granted; plaintiffs' petition was denied.]

[We affirm the judgment of the Court of Appeal.]

## II. DISCUSSION

### A. *Interface Between Anti-SLAPP Statute and Malicious Prosecution*

Code of Civil Procedure section 425.16, the anti-SLAPP statute, provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public

issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id.*, § 425.16, subd. (b)(1).) Under this statute, the party moving to strike a cause of action has the initial burden to show that the cause of action "aris[es] from [an] act . . . in furtherance of the [moving party's] right of petition or free speech." (*Ibid.*; *Equilon, supra,* 29 Cal.4th at p. 67.) Once that burden is met, the burden shifts to the opposing party to demonstrate the "probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1); *Equilon, supra,* 29 Cal.4th at p. 67.) "To satisfy this prong, the plaintiff must 'state[] and substantiate[] a legally sufficient claim.' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741 [3 Cal.Rptr. 3d 636, 74 P.3d 737], fn. omitted (*Jarrow Formulas*).)

 The parties agree that plaintiffs' malicious prosecution action arises from acts in furtherance of defendants' right of petition or free speech.[4] Thus, the issue is whether plaintiffs presented evidence in opposition to defendants' anti-SLAPP motion that, if believed by the trier of fact, was sufficient to support a judgment in plaintiffs' favor. Whether plaintiffs have established a prima facie case is a question of law. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*) ["In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant ([Code Civ. Proc.,] § 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim"].)

### B. *Liability for Continuing to Prosecute Lawsuit Found to Lack Merit*

Previously, this court has characterized one of the elements of the tort of malicious prosecution as *commencing, bringing, or initiating* an action without probable cause. " 'To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was *commenced* by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was *brought* without probable cause [citations]; and (3) was *initiated* with malice [citations].' (*Bertero* [*v. National General Corp.* (1974) 13 Cal.3d 43, 50 [118

---

[4] In *Jarrow Formulas, supra,* 31 Cal.4th at page 741, we declined to create a categorical exemption from the anti-SLAPP statute for malicious prosecution actions.

Cal.Rptr. 184]] [(*Bertero*)]." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676 [34 Cal.Rptr.2d 386, 881 P.2d 1083] (*Crowley*), italics added.)

Defendants contend *continuing* to prosecute a lawsuit discovered to lack probable cause does not constitute the tort of malicious prosecution, and in making this argument they rely heavily on the tort's being a *disfavored* cause of action.

The tort of malicious prosecution is disfavored "both because of its 'potential to impose an undue "chilling effect" on the ordinary citizen's willingness to report criminal conduct or to bring a civil dispute to court' [(*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel Co.*))] and because, as a means of deterring excessive and frivolous lawsuits, it has the disadvantage of constituting a new round of litigation itself (*id.* at p. 873)." (*Wilson, supra*, 28 Cal.4th at p. 817.) For these reasons, we have declined to extend the scope of the tort. (*Crowley, supra*, 8 Cal.4th at p. 680; *Sheldon Appel Co.*, at p. 873.)

On the other hand, we have cautioned that this "convenient phrase," i.e., the characterization of malicious prosecution as a *disfavored* cause of action, "should not be employed to defeat a legitimate cause of action" or to "invent[] new limitations on the substantive right, which are without support in principle or authority." (*Bertero, supra*, 13 Cal.3d at p. 53; see *Crowley, supra*, 8 Cal.4th at p. 680.)

 Confining the tort of malicious prosecution to the *initiation* of a suit without probable cause would be, we conclude, without support in authority or in principle.

### 1. *Authority*

The question we address today is a question of first impression in this court, and was first addressed by a California Court of Appeal only two years ago.[5] However, so far as our research reveals, the rule in every other state that has addressed the question is, and in many states has long been, that the tort of malicious prosecution *does* include continuing to prosecute a lawsuit discovered to lack probable cause.

Over 25 years ago the drafters of the Restatement Second of Torts (Restatement) stated that "one who continues a civil proceeding that has

---

[5] Prior to this case, only one division of the Court of Appeal—Division Seven of the Second District—had addressed this question. (*Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 627–629 [124 Cal.Rptr.2d 556] (*Swat-Fame*); *Vanzant v. DaimlerChrysler Corp.* (2002) 96 Cal.App.4th 1283, 1290–1291 [118 Cal.Rptr.2d 48] (*Vanzant*).) After the decision in this case was filed, *Swat-Fame* was followed by Division Three of the Fourth District. (*Morrison v. Rudolph* (2002) 103 Cal.App.4th 506, 514 [126 Cal.Rptr.2d 747].)

properly been begun or one who takes an active part in its continuation for an improper purpose after he has learned that there is no probable cause for the proceeding becomes liable as if he had then initiated the proceeding." (Rest., § 674, com. c, p. 453.)[6] Indeed, almost 80 years ago Corpus Juris, in reciting the elements of an action for malicious prosecution, stated the first element as the "commencement *or continuance* of an original criminal or civil judicial proceeding." (38 C.J. (1925) Malicious Prosecution, § 5, p. 386, italics added; see 34 Am.Jur. (1941) Malicious Prosecution, § 26, p. 718.)[7]

The Restatement's position on this question has been adopted or was anticipated by the courts of a substantial number of states: Alabama (*Laney v. Glidden Co., Inc.* (1940) 239 Ala. 396 [194 So. 849, 851–852]); Arizona (*Smith v. Lucia* (1992) 173 Ariz. 290 [842 P.2d 1303, 1308]); Arkansas (*McLaughlin v. Cox* (1996) 324 Ark. 361 [922 S.W.2d 327, 331–333]); Colorado (*Slee v. Simpson* (1932) 91 Colo. 461 [15 P.2d 1084, 1085]); Idaho (*Badell v. Beeks* (1988) 115 Idaho 101 [765 P.2d 126, 128]); Iowa (*Wilson v. Hayes* (Iowa 1990) 464 N.W.2d 250, 264); Kansas (*Nelson v. Miller* (1980) 227 Kan. 271 [607 P.2d 438, 447–448]); Mississippi (*Benjamin v. Hooper Electronic Supply Co., Inc.* (Miss. 1990) 568 So.2d 1182, 1189, fn. 6); New York (*Broughton v. State of New York* (1975) 37 N.Y.2d 451, 457 [335 N.E.2d 310, 373 N.Y.S.2d 87]); Ohio (*Siegel v. O.M. Scott & Sons Co.* (1943) 73 OhioApp. 347 [29 OhioOp. 69, 56 N.E.2d 345, 347]); Oregon (*Wroten v. Lenske* (1992) 114 Ore.App. 305 [835 P.2d 931, 933–934]); Pennsylvania (*Wenger v. Philips* (1900) 195 Pa. 214 [45 A. 927]); and Washington (*Banks v. Nordstrom, Inc.* (1990) 57 Wn.App. 251 [787 P.2d. 953, 956–957]).

Even more significantly, defendants have not brought to our attention, nor has our own research revealed, a single state that has declined to adopt the Restatement's view in this regard.

---

[6] Section 674 of the Restatement provides:

"One who takes an active part in the initiation, *continuation* or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if

"(a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and

"(b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought." (Italics added.)

[7] Corpus Juris Secundum continues to state that "[t]he commencement *or continuation* of the original proceeding by defendant against plaintiff is essential to an action for malicious prosecution." (54 C.J.S. (1988) Malicious Prosecution or Wrongful Litigation, § 17, p. 537, italics added.) American Jurisprudence Second concurs, giving the first element of the tort of malicious prosecution as "the institution *or continuation* of original judicial proceedings by, or at the instance of, the defendant." (52 Am.Jur.2d (2000) Malicious Prosecution, § 8, p. 145, fns. omitted & italics added.)

Defendants' position, that the tort of malicious prosecution does not include continuing a lawsuit discovered to lack probable cause, is no more supported by the decisions of this court than it is by out-of-state authority.

Defendants rely upon two decisions of Division Seven of the Second District—*Swat-Fame, supra,* 101 Cal.App.4th 613 and *Vanzant, supra,* 96 Cal.App.4th 1283. In *Swat-Fame,* the plaintiff in a malicious prosecution action contended "a party can be held liable for malicious prosecution even if he or she first becomes aware of facts that negate the claim after the litigation is commenced . . . ." (*Swat-Fame,* at pp. 627–628.) Reiterating the position it had taken five months earlier in *Vanzant,* Division Seven of the Second District Court of Appeal rejected the contention. (*Id.* at p. 628.) *Vanzant* relied upon this court's decision in *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782 [226 Cal.Rptr. 90, 718 P.2d 77] (*Coleman*) for the proposition that "California courts have typically refused to permit malicious prosecution claims where, as here, the claim is based on the continuation of a properly initiated existing proceeding." (*Vanzant,* at pp. 1290–1291.)

*Coleman* is distinguishable. In order to establish a cause of action for malicious prosecution, a plaintiff must prove " 'the prior action . . . was commenced by or at the direction of the *defendant* [in the malicious prosecution action].' [Citation.]" (*Coleman, supra,* 41 Cal.3d at p. 793, italics added.) In *Coleman,* the underlying action was commenced by the *plaintiffs* in the malicious prosecution action. Therefore, in order to establish their cause of action against the defendant's insurer for malicious prosecution, the plaintiffs argued that the insurer, in maliciously causing the defendant to file a frivolous appeal, caused the initiation of a *separate action.* This is the argument the *Coleman* court rejected.

In the underlying action in *Coleman,* the survivors of a man who drowned in a city swimming pool brought a wrongful death action against the city and were awarded $350,000 in damages. During the pendency of the city's appeal, the city's insurer offered the plaintiffs less than half the judgment award to settle, and plaintiffs declined, but later accepted a settlement of $300,000. The plaintiffs then sued the insurer, which allegedly controlled all aspects of the defense, on the ground, among others, of malicious prosecution, claiming the appeal had been frivolous, designed solely to force the plaintiffs to settle for a fraction of the judgment and to enable the insurer to realize interest earnings during the pendency of the appeal based on the differential between the statutory rate of interest and the market rate. (*Coleman, supra,* 41 Cal.3d at pp. 788–789.)

The *Coleman* court distinguished *Bertero, supra,* 13 Cal.3d 43. In *Bertero,* this court held malicious prosecution may include maliciously filing a

cross-complaint. "By seeking affirmative relief [through a cross-complaint]," the *Bertero* court pointed out, the "defendants . . . did more than attempt to repel [the plaintiff's] attack; they took the offensive in attempting to prosecute a cause of action of their own." (*Bertero*, at p. 53.) "By contrast," the *Coleman* court held, "filing an appeal 'is not a separate proceeding and has no independent existence' [citation]; it is merely the continuation of an action. [Citation.] Based on the reasoning of *Bertero*, a defendant's appeal cannot be considered a separate action 'seeking affirmative relief,' but rather is merely the continuation of an attempt 'to repel' plaintiff's attack." (*Coleman, supra,* 41 Cal.3d at p. 794, fn. omitted.)

■ The operative distinction, then, is between continuing a prosecution and continuing a defense. In *Coleman,* the defendant in the malicious prosecution action had merely continued its defense of the underlying wrongful death action by causing the filing of the appeal in that action.[8] Here, according to the evidence presented in opposition to the anti-SLAPP motion, defendants in the malicious prosecution action continued their prosecution of the underlying fraud action after learning it was baseless.

### 2. *Principle*

Just as it is without support in authority, the limitation defendants urge is also without support in principle. Malicious prosecution "is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice." (*Bertero, supra,* 13 Cal.3d at p. 50; see *Crowley, supra,* 8 Cal.4th at p. 677.) Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset. (See 1 Harper et al., The Law of Torts (3d ed. 1996) § 4.3, p. 4:13 ["Clearly, it is as much a wrong against the victim and as socially or morally unjustifiable to take an active part in a prosecution after knowledge that there is no factual foundation for it, as to instigate such a proceeding in the first place"].) As the Court of Appeal in this case observed, "It makes little sense to hold attorneys accountable for their knowledge when they file a lawsuit, but not for their knowledge the next day."

Moreover, as the Court of Appeal went on to point out, "Holding attorneys liable for the damages a party incurs as a result of the attorneys prosecuting civil claims after they learn the claims have no merit also will encourage voluntary dismissals of meritless claims at the earliest stage possible. Because

---

[8] *Vanzant* also relied upon *Merlet v. Rizzo* (1998) 64 Cal.App.4th 53 [75 Cal.Rptr.2d 83] and *Adams v. Superior Court* (1992) 2 Cal.App.4th 521 [3 Cal.Rptr.2d 49]. (*Vanzant, supra,* 96 Cal.App.4th at pp. 1290–1291.) *Merlet* and *Adams* are distinguishable, as well. These two cases simply involved application of the familiar rule that subsidiary procedural actions cannot be the basis for malicious prosecution claims. (*Merlet,* at p. 59; *Adams,* at p. 528.)

an attorney will be liable only for the damages incurred from the time the attorney reasonably should have caused the dismissal of the lawsuit after learning it has no merit, an attorney can avoid liability by promptly causing the dismissal of, or withdrawing as attorney in, the lawsuit. This will assist in the efficient administration of justice and reduce the harm to individuals targeted by meritless claims. Moreover, by advising a client to dismiss a meritless case, the attorney will serve the client's best interests in that the client will avoid the cost of fruitless litigation, and the client's exposure to liability for malicious prosecution will be limited."

Defendants contend our holding—that malicious prosecution includes continuing to prosecute a lawsuit discovered to lack probable cause—would be unworkable and therefore contrary to public policy. Defendants assert the holding would be unworkable because it would divert an attorney's attention away from the zealous representation of his or her client by causing the attorney (1) continually to second-guess the merits of the litigation and (2) to fear retaliation for malicious prosecution if the attorney argues for an extension of the law. We disagree. Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit. (*Wilson, supra,* 28 Cal.4th at p. 817; *Sheldon Appel Co., supra,* 47 Cal.3d at p. 886.) The same standard will apply to the continuation as to the initiation of a suit. Applying the standard in any given case may be very difficult. However, applying it to the decision to continue to prosecute a case should be no more or less difficult than applying it to the decision to initiate a case.[9]

For the reasons stated, we conclude an attorney may be held liable for malicious prosecution for continuing to prosecute a lawsuit discovered to lack probable cause.

## C. *Defendants' Prima Facie Liability*

As we stated earlier, the parties agree that plaintiffs' malicious prosecution action arises from acts in furtherance of defendants' right of petition or free speech. Thus, the issue is whether plaintiffs presented evidence in opposition to defendants' anti-SLAPP motion that, if believed by the trier of fact, was sufficient to support a judgment in plaintiffs' favor. Plaintiffs, we conclude, did make the required showing.

---

[9] Counsel who receives interrogatory answers appearing to present a complete defense might act reasonably by going forward with the defendant's deposition in light of the possibility that the defense will, on testimonial examination, prove less than solid. The reasonableness of counsel's persistence is, of course, a question of law to be decided on a case-by-case basis, and we have no occasion here to formulate more detailed rules.

As the Court of Appeal observed, "Whether the facts known to Stroud constituted probable cause to prosecute the fraud lawsuit is a question of law. (*Wilson, supra,* 28 Cal.4th at p. 817.) The court must 'make an objective determination of the "reasonableness" of [Stroud's] conduct, i.e., to determine whether, on the basis of the facts known to [Stroud], the institution [and prosecution] of the [fraud lawsuit] was legally tenable.' (*Sheldon Appel Co., supra,* 47 Cal.3d at p. 878.) The test applied to determine whether a claim is tenable is 'whether any reasonable attorney would have thought the claim tenable.' (*Id.* at p. 886.) [¶] In the present case, . . . Stroud presented evidence in support of the anti-SLAPP motion to show that the facts available to Stroud *at the time the lawsuit was filed* were sufficient to support a cause of action for fraud. But in opposition to the motion, Zamos presented evidence that Stroud was given transcripts *shortly after the fraud lawsuit was filed* that, Zamos contends, shows that Stroud knew or should have known that the fraud lawsuit had no merit."

### 1. *Zamos's alleged promise to represent Brookes in the foreclosure action*

Brookes alleged that Jerome Zamos told her he would continue to represent her against the nonsettling defendants in the foreclosure lawsuit. However, at the January 29, 1996 hearing, the judge advised Brookes there was a motion pending to relieve Mr. Zamos in the foreclosure matter. "Is there a problem?" he asked her. "No," Brookes replied, "other than I can't understand how Mr. Zamos can be relieved when he's never been my attorney of record to my knowledge." After listening to Brookes's rambling diatribe against Zamos, the judge asked her, "What's the point?" "The point," Brookes replied, "is I don't care if you sign him off or not. He's never been on." Brookes was apparently being sarcastic because as the judge pointed out, Mr. Zamos had tried the foreclosure matter and had persisted in obtaining a favorable settlement for her "when lesser lawyers would have just bowed out." Hearing no objection whatsoever from Brookes regarding Mr. Zamos's motion to be relieved, the judge, after admonishing Brookes that she "couldn't have had a better lawyer than Mr. Zamos," ordered him relieved.

### 2. *Zamos's alleged promise to represent Brookes in the malpractice action*

Brookes alleged that Jerome Zamos told her he would substitute into and represent her in a malpractice lawsuit Brookes had filed against her former attorneys. However, as the Court of Appeal stated, the "transcript of [the] October 30, 1995 settlement hearing in the foreclosure lawsuit . . . shows that before Brookes agreed to the settlement, Brookes and Zamos stated on the

record that Brookes had changed her mind regarding Zamos's representation in the malpractice lawsuit and that Zamos was *not* going to represent Brookes in that lawsuit."

On Friday, October 27, 1995, in a phone call he placed to Brookes in open court, Jerome Zamos advised Brookes he would represent her in the malpractice action. However, on Monday, October 30, 1995, Mr. Zamos advised the court he would not be doing so after all, and that Brookes had another attorney who would be representing her in that matter. Brookes, who was present in court on this occasion, acknowledged, "That's correct, yes."

Defendants assert "there is testimony from Taylor that he was *later* told by Brookes that Zamos had promised to get back into the case." To the contrary, Taylor's statement was unclear in this regard. In a declaration, Taylor stated Brookes told him "she had been promised that Mr. Zamos would continue with the malpractice lawsuit against [her former attorneys] and that it would be taken to a conclusion as long as the offer to settle was accepted." However, Taylor did *not* claim that his second conversation with Brookes occurred *after* Brookes acknowledged in court on Monday, October 30, that Jerome Zamos was *not* going to represent her in the malpractice action. Taylor merely stated he spoke to Brookes on "a Friday in late October of 1995" and again "on the following Monday."

### 3. *Zamos's alleged promise that Brookes's house would be returned to her*

Brookes alleged that Jerome Zamos promised Brookes he would secure the return of her house. As the Court of Appeal stated, "The October 30, 1995 transcript shows that Brookes was told repeatedly that she would be giving up *all* claims to her house if she agreed to the settlement."

Defendants do not dispute this characterization of the record. Instead, defendants claim that, off the record, Jerome Zamos told Brookes "the settlement would be for 'post eviction' damages and that the claim for [her] house could still proceed."

Contrary to Brookes's claim that she agreed to the settlement in reliance on an assurance from Jerome Zamos that she would still be able to proceed with an action to have her house returned to her, Brookes initially declined the settlement, *complaining that he had never discussed it with her.* Then, after having been given an opportunity to consult by phone with someone other than Mr. Zamos, someone who was not an attorney, Brookes decided to accept the settlement.

## III. CONCLUSION

■ Malicious prosecution, we hold, includes continuing to prosecute a lawsuit discovered to lack probable cause. Accordingly, we disapprove of *Swat-Fame, Inc. v. Goldstein, supra,* 101 Cal.App.4th 613, and *Vanzant v. DaimlerChrysler Corp., supra,* 96 Cal.App.4th 1283, as well as *Morrison v. Rudolph, supra,* 103 Cal.App.4th 506, insofar as they are inconsistent with the views expressed herein.

Plaintiffs did present evidence in opposition to defendants' anti-SLAPP motion that, if believed by the trier of fact, was sufficient to support a judgment in plaintiffs' favor. Therefore, we affirm the judgment of the Court of Appeal reversing the order of the trial court dismissing plaintiffs' malicious prosecution claim against defendants.[10]

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

On June 9, 2004, the opinion was modified to read as printed above.

---

[10] Defendants argued below that under *Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375 [90 Cal.Rptr.2d 408], an opinion we cited with approval in *Wilson, supra,* 28 Cal.4th 811, the trial court's order had to be affirmed because Zamos lost their motion for summary judgment in the fraud lawsuit. The *Roberts* court held that a favorable ruling on a motion for summary judgment in the underlying action conclusively establishes probable cause unless that ruling was procured by "materially false facts." (*Roberts,* at p. 384.) The Court of Appeal rejected defendants' argument on the ground that "Zamos presented evidence in opposition to the anti-SLAPP motion that, if believed by the trier of fact, demonstrates that the denial of Zamos's summary judgment motion was procured by materially false facts. As discussed above, the trial court in the fraud lawsuit denied Zamos's motion for summary judgment 'reluctantly,' because Brookes' declaration that Zamos made the representations at issue raised a triable issue of fact. In opposition to the anti-SLAPP motion in the instant case, Zamos presented the declaration of Jerome Zamos, in which Mr. Zamos states that he did not make the representations Brookes asserted he made. If the trier of fact in the instant case believes Mr. Zamos's declaration that he did not make those representations, then the denial of Zamos's summary judgment motion was procured by materially false facts, and the rule set forth in *Roberts* does not apply."

As defendants did not petition for review on this issue, we need not decide whether the Court of Appeal correctly decided it.