Filed 1/19/16  Ryan v. Duran CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DONALD V. RYAN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>LEANDRO H. DURAN,<br><br>        Defendant and Appellant. | A140197<br><br>(Alameda County<br>Super. Ct. No. RG13675716) |

Leandro Duran, a lawyer, represented several clients in misrepresentation claims against Donald Ryan.  He continued to do so even after learning his clients had never met Ryan until well after they supposedly acted in reliance on what Ryan supposedly said.  After Ryan prevailed on all of Duran's clients' claims, he sued for malicious prosecution.  The defendants, including Duran, responded with a special motion to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16),[1] which was denied in nearly all respects.  Duran (but not his former clients) has appealed, and Ryan has cross-appealed.  We conclude the motion should have been denied in its entirety and therefore affirm in part and reverse in part.  We also reverse the fractional award of fees and costs to defendants.

---

    [1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

**BACKGROUND**

*Ryan's Involvement with John Garcia and Dulcy Kelly*

Ryan manages his own IRA account and, in doing so, seeks investment opportunities. In late 2005, he met John Garcia and Dulcy Kelly who were in the business of flipping distressed real estate. Ryan told Garcia and Kelly he might consider making loans to finance some of their ventures.

An opportunity soon arose in connection with a property Garcia and Kelly located in Alameda. Ryan, after evaluating the property, agreed to provide a loan for its purchase and rehabilitation. Using loan proceeds from Ryan, Kelly took title to the property in January 2006.

Two months later, in March, Kelly signed a second promissory note and executed a deed of trust on the property for a construction loan from Ryan in the amount of $160,000. This loan was to be disbursed pursuant to a written schedule of loan "draws." The initial draw of $40,000 was intended to cover $10,000 in loan fees, $10,000 to pay off another loan from Ryan (unrelated to either the acquisition or construction loan), and preliminary construction costs, plans, and permit fees. The remainder of the loan, $120,000, was to be disbursed after certain construction milestones. Ryan was to administer the funds to assure proper disbursement. Both Kelly and Garcia agreed to hold Ryan harmless and to indemnify him for any claims related to loan administration.

On the record before us, the parties' performance under the construction loan is not entirely clear (a complete record of loan disbursements and payments was not provided). The first documentary evidence of a disbursement are notes accompanying a $20,000 check made out to Kelly dated October 11, 2006, and marked received on October 19, 2006. The notes suggest an intent to allocate $10,000 to "principle" (which loan is unspecified), $307.58 to "interest" and "late fees" (again, which loan is unspecified) and $9,692.42 to Kelly. On the day Kelly received the check, she and Garcia signed an agreement with Ryan promising to repay a $6,100 loan (apparently yet

2

another loan, a short-term one, from Ryan) by December 1, 2006 or "upon receipt of the fourth draw on the construction loan," if that date was sooner. Later in December, Kelly appears to have borrowed still more money from Ryan, this time $33,057.64, to be repaid by February 25, 2007. Kelly apparently executed another deed of trust to secure this loan. In January 2007, by a written addendum to the construction loan promissory note, Kelly and Ryan agreed to an immediate, accelerated, and combined payout of the final two draws of the construction loan, draws six and seven, "on execution" of the addendum. Apparently, however, this repayment did not occur.

In any case, no one disputes Kelly defaulted on her various loan obligations, and Ryan, in May 2007, "initiated foreclosure proceedings on the property pursuant to the trust deeds on the" Alameda property. The foreclosure was finalized by September and a trustee's deed was recorded in December.

Meanwhile, even as the foreclosure proceedings were underway, John Garcia contacted Purofirst and its principal, Edward Garcia (no relation), to contract for construction services. On Purofirst's June 13, 2007 intake form, John Garcia was listed as the "owner/contact." Ryan was listed as a "financier," as was a Brian Clift. The following day, on June 14, 2007, John Garcia signed a Purofirst services authorization form. Work began on the Alameda property that month, and Purofirst sent its bills to John Garcia.

By August, Purofirst had been paid only $1,000 but believed it was owed some $75,000. Purofirst questioned John Garcia, who blamed his lender, Ryan, for not releasing loan funds.

Purofirst then contacted Ryan, and they agreed to meet. All this is set out in a letter Ryan wrote to Purofirst, dated August 16, 2007. The letter stated a final $20,000 draw remained on the construction loan and recognized Purofirst "had a claim against" the draw. The letter also memorialized a few proposed deals Ryan and Purofirst had discussed on that date as a way for both of them to get out of the situation with John

3

Garcia. John Garcia, it turned out, could no longer be contacted, and Ryan and Purofirst could not reach an agreement.

About 10 days later, Purofirst recorded a mechanics lien for $93,793.61 against the Alameda property. The lien listed John Garcia and his partner Kelly as having requested the contracting services. Ryan was not mentioned. The lien was apparently not perfected.

After Ryan completed foreclosing on the Alameda property in September, he concluded he could not hold the real estate in his IRA and sold it to friends, Robert and Heather Scheblein.

*The Underlying Lawsuit for Misrepresentation*

In December 2007, Purofirst sued John Garcia, Kelly, Clift and Ryan. The initial complaint alleged nine causes of action against each defendant: breach of contract, breach of the covenant of good faith and fair dealing, fraud, deceit, intentional misrepresentation, negligent misrepresentation, concealment, false promise, and unjust enrichment.

After apparently having a demurrer sustained with leave to amend, Ryan wrote to Purofirst's counsel, Duran, on June 3, 2008, advising he would pursue a malicious prosecution action should the lawsuit continue. In addition to highlighting the trial court's demurrer ruling in his favor, Ryan stated his belief Purofirst's license had not been in order at the time it completed its work and this would foreclose any claim for payment. Ryan demanded dismissal of the lawsuit as to him, and also suggested it would be unethical for counsel to proceed against the other defendants.

Duran nevertheless proceeded. A first amended complaint, filed in July 2008, added causes of action for conversion and trespass to chattels and also alleged a civil conspiracy amongst the defendants to commit wrongful acts. A second amended complaint, filed in October 2008, added a cause of action called "Common Count: Goods and Services Rendered." A third amended complaint, filed in February 2009, limited the

4

contract claims to John Garcia. These claims were voluntarily dismissed as to Ryan. A fourth amended complaint was filed in September 2009.[2]

A year later, in September 2010, Edward Garcia (Purofirst's principal) was deposed. Garcia conceded he never met Ryan until their meeting in mid-August 2007—after Purofirst's construction work on the Alameda property was already complete. He further testified Ryan did nothing to induce Purofirst's June 2007 contract with John Garcia and admitted Purofirst never presented invoices to Ryan for payment. Edward Garcia thought Ryan was working with John Garcia, however, based on statements John Garcia had made. Asked to explain, Edward Garcia thought John Garcia might have used the term "financier," as appears on the Purofirst intake documents, or maybe used a term that made Edward Garcia think of the term "partner," but he was not sure. Based on what John Garcia said, Edward Garcia thought, in his own mind, that Ryan and the others had met together as investors.

After another year rolled by, a fifth amended complaint was filed in August 2011. This pleading added one final cause of action, for account stated. It also added the Schebleins as defendants.

Purofirst's claims against Ryan went to trial in April 2012. In closing argument, Duran conceded the only person who made alleged misrepresentations was John Garcia, not Ryan. He therefore pressed a conspiracy theory against Ryan. He also argued Ryan could be held liable for payment to Purofirst on the theory of unjust enrichment.

The trial court found none of Purofirst's causes of action against Ryan was supported by the evidence. The court concluded Ryan and Purofirst were not in privity of

---

[2] Duran has requested judicial notice of two trial court rulings regarding Ryan's demurrers. These orders were not presented to the trial court in this malicious prosecution action and do not affect our resolution of this appeal. The request for judicial notice is denied.

contract and Ryan was merely a lender of funds to Kelly, not a conspirator, partner, or joint venturer. Purofirst had sued "the wrong party," a "stranger to the transaction."

*The Instant Malicious Prosecution Case*

Having successfully defended against Purofirst's litany of claims, Ryan brought this suit for malicious prosecution against Edward Garcia, Purofirst, Duran and related persons and entities. The defendants responded with a special motion to strike under the anti-SLAPP statute.

The trial court largely denied the motion, concluding Ryan had made the requisite minimal showing that defendants, including Duran, prosecuted Purofirst's claims without probable cause and with malice, except for the cause of action for "unjust enrichment." Thus, the trial court granted the motion as to the malicious prosecution "claim" based on that underlying cause of action. For their fractional success on the motion, the court awarded defendants one-tenth, or $1,200, of the $12,000 they claimed in attorney fees.

Duran (but not Purofirst or Edward Garcia) appealed. Ryan cross-appealed.

## DISCUSSION

Under California's anti-SLAPP statute, a cause of action arising from a defendant's act in furtherance of a constitutionally protected right of free speech shall be stricken unless the plaintiff shows a probability of prevailing on the merits. (§ 425.16, subd. (b)(1).) All agree Ryan's malicious prosecution lawsuit arises from protected activity. The only dispute is whether Ryan made a sufficient showing of probable success. (See § 425.16, subd. (e); *Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105 (*Cole*).)

We consider that issue de novo. (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 425 (*Bently Reserve*).) Applying a "summary-judgment-like" test (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714), we accept as true the admissible evidence favorable to Ryan, and evaluate the defendants' evidence only to determine whether it defeats Ryan's showing as a matter of law. (*Bently Reserve*, *supra*, at pp. 425–426; *Cole*,

6

*supra*, 206 Cal.App.4th at pp. 1104–1105). "The plaintiff's cause of action needs to have only ' "minimal merit" [citation]' to survive an anti-SLAPP motion." (*Cole*, *supra*, at p. 1105.)

To succeed, a malicious prosecution plaintiff must show a prior lawsuit (1) was litigated by or at the direction of the defendant and pursued to a legal termination favorable to the plaintiff; (2) was litigated without probable cause; and (3) was litigated with malice. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292, 296 (*Soukup*); *Zamos v. Stroud* (2004) 32 Cal.4th 958, 960 (*Zamos*).) Moreover, there must have been probable cause to litigate every cause of action in the underlying lawsuit, as a malicious prosecution action will lie even when only " 'one of alternate theories of recovery is maliciously asserted.' " (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

Ryan's complaint purports to bring 11 separate malicious prosecution claims for each of the 11 causes of action Purofirst asserted against him. As we discuss, however, only one malicious prosecution cause of action arises from the underlying suit. Neither the parties nor the trial court recognized this, and it has a significant impact on the proper analysis of the anti-SLAPP motion.

"Whether a complaint in fact asserts one or more causes of action for pleading purposes depends on whether it alleges invasion of one or more primary rights. 'The primary rights theory is a theory of code pleading that has long been followed in California. It provides that a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.]' (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 . . . [suit for malicious prosecution lies for bringing an action charging multiple grounds of liability when some but not all of those grounds were asserted with malice and without probable cause].) 'As far as its content is concerned, the primary right is simply

7

the plaintiff's right to be free from the particular injury suffered. It must therefore be distinguished from the *legal theory* on which liability for that injury is premised.' (*Ibid.*)" (*Hindin v. Rust* (2004) 118 Cal.App.4th 1247, 1257 (*Hindin*).)

"The manner in which a plaintiff elects to organize his or her claims within the body of the complaint is irrelevant to determining the number of causes of action alleged under the primary right theory. '[I]f a plaintiff states several purported causes of action which allege an invasion of the same primary right he has actually stated only one cause of action.' " (*Hindin*, *supra*, 118 Cal.App.4th at p. 1257.) "Specifically in the context of a malicious prosecution action, the Supreme Court has explained, 'When a complaint alleges multiple theories of liability or "counts," the counts "are merely ways of stating the same cause of action differently." ' " (*Ibid.*) Thus, when a prior action involves multiple causes of action, the subsequent malicious prosecution action seeks "to vindicate a single primary right—the right to be free from defending against a lawsuit initiated with malice and without probable cause." (*Id.* at p. 1258.)

As noted, the anti-SLAPP statute permits striking only a "cause of action." (§ 425.16, subd. (b)(1).) And for purposes of an anti-SLAPP motion, the primary rights theory applies to define "cause of action" and to limit what can be struck. (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 659; *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 162; see also *Tendler v. www.jewishsurvivors.blogspot.com* (2008) 164 Cal.App.4th 802, 811–812 (conc. opn. by McAdams, J.).)

Thus, a plaintiff who " 'can show a probability of prevailing on *any part* of *its claim*' " does not have a meritless claim and a motion to strike is not proper—" 'the entire *cause of action* stands.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis*), third italics added.) So, if a cause of action arising *entirely from protected activity*, as here, asserts "a number of acts of alleged misconduct and theories of recovery, . . . for purposes of reviewing the ruling on an anti-SLAPP motion, it is

sufficient to focus on just one," if that one has the requisite merit. (*Id.* at p. 821; see also *Bently Reserve*, *supra*, 218 Cal.App.4th at p. 426 ["When a cause of action states multiple grounds for relief, 'the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any' one of those grounds."]; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 382; *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1211; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 106; cf. *Cho v. Chang* (2013) 219 Cal.App.4th 521, 527 [recognizing *Oasis* and holding a trial court could nonetheless strike those meritless portions of a cause of action arising from protected constitutional activity while leaving potentially meritorious portions arising from unprotected activity[3]].)

Here, then, because Ryan's multi-count complaint actually states just one malicious prosecution cause of action premised on numerous theories, Ryan, in response to the anti-SLAPP motion, needed to show only the requisite merit as to *any one* of those theories. Thus, if Ryan made an adequate showing that (a) Purofirst lost the prior lawsuit and (b) the defendants litigated *any* of the causes of action asserted therein without probable cause and with malice, then Ryan defeated the anti-SLAPP motion. There was no need, in other words, for the trial court to undertake separate probable cause and malice analyses as to each cause of action asserted in the underlying lawsuit once it determined Ryan made the requisite showing as to at least one of the asserted causes of action.

---

[3] Whether mixed causes of action (i.e., those based on both protected and unprotected activity) can be parsed in this way is now before our Supreme Court. (*Baral v. Schnitt* (2015) 233 Cal.App.4th 1423, review granted May 13, 2015, S225090.) Since this case concerns only protected activity, we need not wade into this controversy. *Oasis* squarely applies and we must follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 257.)

9

*Lack of Probable Cause to Prosecute Underlying Claims*

"The question of probable cause is 'whether, as an objective matter, the prior action was legally tenable or not.' " (*Soukup*, *supra*, 39 Cal.4th at p. 292.) Probable cause is absent when a litigant relies upon facts the litigant has no reasonable basis to believe are true, or when a litigant pursues an untenable legal theory given the known facts. (*Ibid.*) One "may be held liable for malicious prosecution for continuing to prosecute a lawsuit discovered to lack probable cause." (*Zamos*, *supra*, 32 Cal.4th at p. 970.) Thus, an order overruling a demurrer is irrelevant to the probable cause inquiry if the evidence ultimately fails to substantiate a pleaded cause of action but the plaintiff nonetheless presses on. (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 346 & fn. 19; *id*. at p. 364 [such an order may establish legal tenability, but "[b]ecause such an order does not address the evidence, . . . it does not establish the *factual* tenability of the claim."] (dsn. opn. of Mosk, J.).)

Purofirst's misrepresentation claims (deceit, intentional misrepresentation, negligent misrepresentation, concealment, false promise, and goods and services rendered) sought to recover $93,793, the value of the work it allegedly was induced to perform on the Alameda property between June and August 2007. The fundamental problem with these claims was that Purofirst and Duran continued to prosecute them against Ryan despite knowing, at least by the 2010 deposition of Edward Garcia, that Ryan had no direct role in inducing Purofirst to work on the property. Edward Garcia admitted he never met Ryan until after all construction work was complete and that Ryan never said or did anything to induce Purofirst to contract with John Garcia. Indeed, Duran acknowledged during closing argument in the underlying case that Ryan was not personally responsible for making any misrepresentations.

That leaves the assertion the defendants had probable cause to pursue Ryan on a secondary liability theory, namely that Ryan and John Garcia were conspirators or joint venturers. Conspiracy and joint venture liability are not stand-alone causes of action, but

10

legal doctrines "that impose[] liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 [conspiracy]; see *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 134, fn. 12 [joint venture]; CACI No. 3712 [joint venture jury instruction].)

To prove civil conspiracy, a plaintiff must "provide substantial evidence of three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.) A knowing, purposeful agreement to achieve a tortious plan is critical. (*Id.* at pp. 1581–1582.) Without "a meeting of the minds" the torts of two individuals, even if apparently acting together, do not amount to conspiracy. (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333–334 (*Choate*).) The requisite agreement may be inferred from conduct, but it must exist. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785.) Liability premised on participation in a joint venture similarly requires proof of an agreement for the purpose of accomplishing a shared goal. (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1051–1052.)

"[C]onjecture" or theories without proof do not support a conspiracy or joint venture. (*Choate*, *supra*, 86 Cal.App.4th at pp. 333–334; *Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 596–597.) Nor is such secondary liability permissible simply because someone "had reason to know" of, or was present during, another's unlawful activities and did not intervene. (*Harris v. Capitol Records Distributing Corp.* (1966) 64 Cal.2d 454, 462; *Wawanesa Mutual Ins. Co. v. Matlock* (1997) 60 Cal.App.4th 583, 590.)

Thus, when a plaintiff had only a "suspicion," but no supporting evidence, that two individuals were "in cahoots" to conceal taking title to a property, a jury was

11

"abundantly reasonable" in finding the plaintiff lacked probable cause to press a conspiracy claim and was subject to a malicious prosecution claim. (*Palmer v. Zaklama* (2003) 109 Cal.App.4th 1367, 1383.) Similarly, just because one individual had called another a "partner" did not implicate that person in a conspiracy where the partnership's existence was dubious or unsupported by evidence. (*Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152, 154, 159 [affirming a no probable cause finding and malicious prosecution judgment after bench trial].) Nor did a plaintiff have probable cause to pursue conspiracy-based fraud claims against the founder, then outside-director, of a corporation merely because he was present at key meetings, benefited from challenged sales of stocks, and engaged in dishonest business practices when he had worked for the corporation years before. Plaintiff's lawyers "drew logically flawed inferences from known facts or stretched those facts to fit their fraud-based theories." (*Cole*, *supra*, 206 Cal.App.4th at pp. 1103, 1106–1107, 1113.) Those lawyers had "not shown that they had a plausible reason to believe Cole was involved in Peregrine's day-to-day operations or that he participated in preparing Peregrine's publicly released statements." (*Id.* at p. 1113 [malicious prosecution plaintiff thus made prima facie showing in response to anti-SLAPP motion].)

In light of these cases, a conspiracy or joint venture between John Garcia and Ryan appears speculative, and we certainly cannot conclude Duran proved either as a matter of law. That some of the $160,000 in construction loan funds might not have not been spent on construction, per se, does not suggest Ryan agreed with John Garcia to facilitate a misallocation of funds. Nor does the fact Ryan agreed to extend a payment deadline and agreed to trigger Kelly's and John Garcia's payment obligation upon receipt of a particular draw on the construction loan make out an agreement to divert construction money back to Ryan. Moreover, all of the agreements about the disbursement schedule and repayment of the loans took place *before* Ryan initiated foreclosure proceedings, and John Garcia did not even contact Purofirst about

12

construction work until well *after* foreclosure was underway.  In short, there appears to be no *evidence* of an agreement or conspiracy to defraud Purofirst, as the trial court in the underlying action found.

Ryan's "concession" in his later letter to Purofirst that it "ha[d] a claim against" the last remaining $20,000 construction loan draw (otherwise due to Kelly and John Garcia under the terms of the loan) is not an admission Ryan directly owed Purofirst any money.  Nor does it manifest an agreement with Kelly or John Garcia to defraud Purofirst or ratify fraudulent conduct.  Nor do Ryan's offers to Purofirst to "fix" the situation imply an agreement to defraud or ratify fraudulent conduct.  On the contrary, Ryan's proposals to Purofirst were presented as a way for *each* of them to escape from the troubled dealings with Kelly and John Garcia.

Ultimately, the conspiracy or joint venture theories defendants posited seem utterly implausible.  (See *Cole*, *supra*, 206 Cal.App.4th at p. 1113.)  Ryan would arguably benefit from Kelly and John Garcia defrauding Purofirst only if Ryan foreclosed on the property, reaping any value of the construction work, while divesting Kelly and John Garcia of their ownership interests.  Defendants have never offered a rational explanation for why Kelly and John Garcia would enter such a self-defeating agreement.  Instead, the *evidence* shows that Kelly and John Garcia were trying desperately to stave off foreclosure by extending loan payment deadlines.

Duran's remaining arguments as to why defendants had probable cause to pursue Ryan are equally meritless.  The various summary judgment rulings do not aid him.  While the trial court granted summary adjudication to Purofirst on some of Ryan's affirmative defenses, that ruling had no bearing on the ultimate success of, and probable cause to prosecute, any of Purofirst's claims.  As for Purofirst's motion for summary judgment on its false promise claim, the trial court *denied* it, concluding Purofirst had failed to meet its burden to "prove each element of the cause of action" and "failed to submit competent evidence showing" Ryan owed the sum alleged.  Further, Ryan raised a

13

fact issue as to any amount owed. Duran mistakenly latches onto the bare words "triable issue of material fact" without understanding these words describe what Ryan created—not Purofirst. Nor is there any relevance to the trial court's denial, midtrial, of nonsuit as to the *Schebleins*, the couple that purchased the Alameda property from Ryan. By trial, the Schebleins were only facing an unrelated cause of action (unjust enrichment) and the trial court denied nonsuit only because it viewed the Schebleins' fate as inseparable from Ryan's, and Ryan had not moved for nonsuit.

We therefore conclude Ryan made a sufficient showing defendants acted without probable cause in continuing to litigate their underlying misrepresentation claims, and we turn to the question of whether he also made a prima facie showing of malice.

*Acting With Malice*

Malice is born of knowledge, and malice is inferable "when a party continues to prosecute an action after becoming aware that the action lacks probable cause." (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 226, italics omitted; see also *Soukup*, *supra*, 39 Cal.4th at p. 292; *Cole*, *supra*, 206 Cal.App.4th at p. 1114.)

Here, the lack of evidence connecting Ryan to the misrepresentation claims asserted in the underlying lawsuit and the speculative nature of these claims, was likely apparent before, or at least by the time of, Edward Garcia's 2010 deposition. Yet, defendants continued to litigate these claims for two more years. This was sufficient to meet the minimal showing of inferable malice required to defeat a special motion to strike.

Duran argues Ryan failed, however, to counter an unclean hands defense to his malicious prosecution suit. " ' "The [unclean hands] rule is settled in California that whenever a party who, as actor, seeks to set judicial machinery in motion and obtain some remedy, has violated conscience, good faith or other equitable principle in his prior conduct, then the doors of the court will be shut against him . . . ; the court will refuse to

14

interfere on his behalf to acknowledge his right, or to afford him any remedy." ' " (*Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 289–290 (*Pond*).)

To be sure, unclean hands may be a defense to a malicious prosecution action, but only if the malicious prosecution plaintiff "directly 'infected' " the malicious prosecution claim by, for instance, interfering in the underlying lawsuit and thereby furthering the very malicious prosecution alleged. (*Pond*, *supra*, 151 Cal.App.3d at p. 290.) This comports with the general rule that unclean hands only bars a plaintiff's suit when the plaintiff has "soiled hands . . . relate[d] 'directly to the transaction concerning which the complaint is made.' " (*Ibid.*)

Defendants' unclean hands defense, however, is not based on how Ryan defended against or litigated the underlying lawsuit, but on his conduct at issue in that lawsuit and which the trial court adjudged was *not* wrongful. Accordingly, defendants by no means established an unclean hands defense to Ryan's malicious prosecution action.

In sum, we conclude the defendants' special motion to strike should have been denied in its entirety. Ryan made an adequate showing on the merits in connection with the misrepresentation causes of action in the underlying lawsuit—both as to lack of probable cause to prosecute them and as to malice—to defeat the motion. The only error by the trial court was not viewing Ryan's lawsuit as a single cause of action for malicious prosecution and in parsing out and granting the special motion to strike as to the malicious prosecution "claim" based on the cause of action in the underlying lawsuit for unjust enrichment.[4]

Given our conclusion that the special motion to strike should have been denied in its entirety, we also reverse the fractional award of costs and attorney fees to defendants in connection with that motion.

---

[4] We therefore need not and do not separately address whether Duran also lacked probable cause and acted maliciously in pursuing the unjust enrichment cause of action in the underlying lawsuit.

## DISPOSITION

The trial court's order on defendants' anti-SLAPP motion is affirmed to the extent it denied the motion, and is reversed to the extent it granted the motion. The award of costs and fees to defendants is also reversed. Respondent and appellant (Ryan) is awarded costs on appeal.

_____
Banke, J.

We concur:

_____
Humes, P. J.

_____
Margulies, J.

A140197, *Ryan v. Duran*