[No. B215034. Second Dist., Div. One. Sept. 28, 2010.]

GEORGE ANTOUNIAN et al., Plaintiffs and Appellants, v.
LOUIS VUITTON MALLETIER et al., Defendants and Respondents.

CₒUNSEL

Macias Counsel, Sean E. Macias; Law Offices of Willam F. Salle and William F. Salle for Plaintiffs and Appellants.

Steptoe & Johnson, Mark A. Neubauer and Dylan Ruga for Defendants and Respondents Louis Vuitton Malletier and Christian Dior Couture, S.A.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, Mark T. Drooks and Sharon Ben-Shahar for Defendants and Respondents Arent Fox LLP, Steven Kimelman and Janine Gargiulo.

OₚINION

**JOHNSON, J.**—In 2006, manufacturers of luxury goods Louis Vuitton Malletier (Louis Vuitton), Christian Dior Couture, S.A. (Dior) (collectively, Louis Vuitton/Dior), and Burberry Limited (Burberry) sued George and Marijeanne Antounian (the Antounians), among others, in federal court, asserting claims for trademark infringement and counterfeiting alleged to have occurred at the Antounians' store in "Santee Alley" in downtown Los Angeles. Burberry dismissed its claims against the Antounians in March 2007. In April 2007, the federal district court denied the Antounians' motion for summary judgment, and in June 2007 the district court granted Louis Vuitton/Dior's motion to dismiss the Antounians from the litigation, on the condition that the two manufacturers pay the Antounians $75,875 in attorney's fees and costs.

In August 2008, the Antounians filed a malicious prosecution action in superior court against Louis Vuitton/Dior, the manufacturers' law firm, Arent Fox LLP, and individual Arent Fox lawyers Steven Kimelman and Janine Gargiulo (the lawyer defendants). Louis Vuitton/Dior and the lawyer defendants filed separate motions to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP (strategic lawsuit against public participation) statute),[1] and the trial court granted both motions in early 2009. This appeal ensued.

---

[1] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

## BACKGROUND

### I. *The underlying 2006 lawsuit alleged counterfeiting activity by the Antounians at Bijou Palace in Santee Alley.*

In 2004, Louis Vuitton, Dior, Burberry, and other companies hired a company named Investigative Consultants to investigate suspected counterfeiting activity on Santee Street in downtown Los Angeles, in an area referred to as Santee Alley. Santee Alley contains hundreds of shops, booths, and stands that sell clothing, jewelry, handbags, and other items. One of the locations investigated was a building whose address was 1116 Santee Street (the Fisch Building), owned by Leonard B. Fisch and his company, Fisch Properties L.P. The Fisch Building was divided into narrow storefronts at eight business addresses leased and subleased to different tenants, who were allowed to use the space in front of their stores, including one-half of the column on either side of the storefront. The Antounians' store, Bijou Palace,[2] was located at 1116 Santee Alley, between two other businesses at 1116 1/2 and 1114 1/2 Santee Alley.[3]

After Investigative Consultants reported counterfeiting activity in the Santee Alley area, Louis Vuitton, Dior, and Burberry filed a federal complaint on July 10, 2006, in the United States District Court for the Central District of California, with Louis Vuitton/Dior represented by the law firm of Arent Fox (the 2006 federal action). The complaint alleged trademark infringement and counterfeiting against a number of individuals and businesses, including the Antounians and Bijou Palace. The complaint also asserted claims for vicarious trademark counterfeiting against Leonard Fisch and Fisch Properties (the landlord defendants).

The 60-page complaint alleged numerous specific instances of counterfeiting activity based on investigative reports, and attributed some counterfeiting activity to Bijou Palace. After Arent Fox determined that the list of alleged counterfeiting in the initial complaint did not properly distinguish between 1116 Santee Alley (Bijou Palace) and a different business at 1116 1/2 Santee

---

[2] Bijou Palace was a fictitious business name of Marijeanne Antounian.

[3] The business addresses in the Fisch Building were numbered 1114, 1114 1/2, 1116 (Bijou Palace), 1116 1/2, 1118A, 1118B, 1118C, and 1118D, on what the Antounians call "Santee Street" and Louis Vuitton/Dior and the lawyer defendants call "Santee Alley." The Antounians state "Santee Street is often referred to as 'Santee Alley,'" and the diagram of the Fisch Building attached to George Antounian's declaration dated November 7, 2008, gives the individual addresses as "Santee Street (Alley)." For the purpose of distinguishing the Fisch Building address, 1116 Santee Street, from the addresses of the individual businesses (a distinction that apparently at times eluded the parties), we will use the designation Santee Alley for the individual businesses, including the Antounians' Bijou Palace at 1116 Santee Alley.

Alley, Louis Vuitton, Dior, and Burberry filed an amended complaint in December 2006. The amended complaint, also 60 pages long, described the area as including "sidewalk-entry 'bazaars' and sub-stores that are sub-leased by the main tenant and occupied by other tenants, sub-tenants, and concessionaires." The complaint detailed purchases of counterfeit merchandise and the presence of counterfeit merchandise at 1116 Santee Alley (identified as "1116 South Santee"), under the business name "Bijou Palace," "Gaby," or "Name Unknown."

After the filing of the amended complaint, however, Arent Fox learned in March 2007 that some of the investigative reports (the basis of the specific allegations) mistakenly attributed to Bijou Palace counterfeiting activity that had actually occurred at businesses nearby. The mistaken reports were by investigator Arianna Ortiz, dated March 1, 2006, and May 26, 2006. Arent Fox also learned, during the deposition of Burberry's person most knowledgeable, Fabio Silva, that the amended complaint incorrectly stated that purchases of counterfeit items on June 8, 2006, occurred at 1116 Santee Alley, when the investigative report of the same date gave the address as 1116 1/2 Santee Alley. Because the complaint's only allegation that the Antounians had sold counterfeit Burberry items mistakenly relied on the June 8, 2006 report of counterfeit purchases next door at 1116 1/2 Santee Alley, in March 2007 Burberry dismissed its claims against the Antounians.

### A. *The Antounians' motion for summary judgment was denied.*

The Antounians filed a motion for summary judgment in the district court on March 19, 2007, arguing that they did not sell or display any counterfeit merchandise. In opposition, Louis Vuitton/Dior cited evidence of counterfeiting activity at Bijou Palace, citing investigative reports and declarations other than those that had been found to be incorrect.[4]

On January 16, 2006, investigator Ortiz observed counterfeit items including eight Louis Vuitton handbags for sale on a rack leaning against the front wall of Bijou Palace.

On April 27, 2006, investigator Ortiz bought a counterfeit Dior handbag from a woman named Gaby, who had a rack of merchandise on which counterfeit Louis Vuitton and Dior merchandise was displayed, leaning against the wall between Bijou Palace and its neighboring shop at 1114 1/2 Santee Alley.

---

[4] Arent Fox attorneys Steven Kimelman and Janine Gargiulo later stated in declarations that after the mistakes in two investigative reports and the misattribution in the complaint were discovered, the underlying reports—March 1, 2006, May 26, 2006, and June 8, 2006—were not used against the Antounians.

On May 17, 2006, investigator Ortiz observed counterfeit Louis Vuitton handbags and wallets and counterfeit Dior handbags and wallets on a rack leaning against the wall in front of Bijou Palace and operated by Gaby.

On June 24, 2006, another investigator, Yvette Rabago, entered Bijou Palace and spoke to an employee named Gabriella, who showed her around the store. Investigator Rabago observed counterfeit Louis Vuitton jewelry offered for sale inside Bijou Palace.

Kristopher Buckner, the owner and president of Investigative Consultants, stated in a declaration that some tenants in the Fisch Building "allow other vendors of counterfeit merchandise to operate from within the space immediately in front of their stores, or even charge vendors for the right to operate from public property in the Alley in front of their businesses. Two tenants at adjacent properties sometimes jointly lease the space to counterfeiters along the front wall between the doors of the two businesses. When this is the case, the two tenants usually share the proceeds from the sublet."

In reply, the Antounians argued that the declarations of investigator Ortiz and investigator Rabago "should be disregarded as 'sham'" because of additional details in the declarations not appearing in the investigative reports. George Antounian stated in a declaration that the Antounians never authorized the placement of racks outside their store, had no relationship with Gaby or anyone else operating a rack, and never received consideration for the placement of a stand outside Bijou Palace.

The district court denied the Antounians' motion for summary judgment on April 16, 2007, concluding "triable issues of fact remain with respect to the Antounians' involvement in the sale of counterfeit merchandise bearing Louis Vuitton and Christian Dior trademarks and copyrights."[5]

### B. *Louis Vuitton/Dior dismissed the Antounians from the lawsuit.*

On May 23, 2007, Louis Vuitton/Dior filed a motion to dismiss the Antounians from the federal action without prejudice, contingent on the district court's denial of the Antounians' cross-motion for attorney's fees. Louis Vuitton/Dior's motion stated that after bringing the action, counterfeiting activity on Santee Alley had decreased, and the companies wanted to focus on the case against the landlord defendants.[6] The Antounians' cross-motion requested $187,000 in attorney's fees as a condition for dismissal.

---

[5] The landlord defendants also filed a motion for summary judgment. The district court granted the motion as to a claim for vicarious trademark infringement, but denied summary judgment on claims for contributory trademark infringement and contributory and vicarious copyright infringement.

[6] Defaults had been entered against all the merchant defendants who had been served.

In an order dated June 14, 2007, the district court stated that it had the discretion to dismiss the claims against the Antounians under Federal Rules of Civil Procedure, rule 41(a)(2) (28 U.S.C.), which provides that once a defendant has filed an answer or motion for summary judgment, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." The question was " 'whether the defendant will suffer some plain legal prejudice as a result of the dismissal.' " The Antounians did not argue that dismissal would cause them legal prejudice, and federal law was clear that the expense incurred in defending against a lawsuit was not legal prejudice. Recognizing that it was not required to award fees, the district court decided that an award of some fees was appropriate, specifically excluding fees for preparing the summary judgment motion. "That misguided motion, though highlighting some of the evidentiary weaknesses of Plaintiffs' claims against the Antounians, expressly asked the Court to ignore genuine issues of material fact. . . . Put simply, an experienced attorney such as the Antounians' counsel should have known that the Antounians' Motion for Summary Judgment had no chance of success." Noting that the Antounians had threatened to sue for malicious prosecution, the district court excluded additional fees for work that could be used in any future litigation. The district court awarded $65,175 in attorney's fees and $10,700 in costs, for a total of $75,875.

The court added: "In reaching its conclusion that Plaintiffs' voluntary dismissal of the Antounians should be conditioned upon the payment of $75,875 to the Antounians, the Court makes no findings concerning the relative merits of the parties' claims and defenses. Nor does the Court intend for this Order to have any effect on future litigation between the parties."

Louis Vuitton/Dior agreed to pay the fees and costs, and the Antounians were dismissed on June 20, 2007.

C. *Investigator Ortiz disavowed part of her April 27, 2006 investigative report during trial.*

Trial proceeded against the landlord defendants. Investigator Ortiz testified to the mistakes (described above) in her March 1, 2006 and May 26, 2006 investigative reports, which had attributed to Bijou Palace counterfeiting activity which actually occurred nearby, and which she had reported to her supervisor and to Janine Gargiulo of Arent Fox. On cross-examination, Ortiz testified to an additional mistake in her investigative report dated April 27, 2006: after reviewing a videotape taken during her April 27, 2006 visit, she concluded that the rack on which she saw displayed counterfeit Louis Vuitton handbags and Louis Vuitton and Dior wallets was placed closer to the adjoining business (1114 1/2 Santee Alley) than to Bijou Palace (1116 Santee

Alley), and the purchase should have been attributed to the adjoining store. Investigator Ortiz confirmed the investigative report's statement that just before her April 27 visit Gaby had told investigator Ortiz to meet her "At 1116, Bijou."

The case against the landlord defendants settled during trial on July 16, 2007.

## II. *The Antounians filed an action for malicious prosecution in 2008.*

On August 14, 2008, the Antounians filed a complaint in Los Angeles Superior Court, naming Louis Vuitton/Dior, Arent Fox, and Arent Fox lawyers Steven Kimelman and Janine Gargiulo as defendants,[7] and alleging that the 2006 federal action constituted malicious prosecution. The complaint alleged that "based on the evidence gathered during the Santee Alley Project, [the investigative reports] were false in every material respect as it [*sic*] related to Bijou Palace and the Antounians and any alleged claims of copyright and trademark infringement of Defendants Louis Vuitton and Dior's products," and that defendants knew the allegations against the Antounians were false.

### *The trial court granted defendants' anti-SLAPP motions.*

On September 15 and 16, 2008, Louis Vuitton/Dior and the lawyer defendants filed separate anti-SLAPP motions to strike the Antounians' malicious prosecution action under section 425.16. The motions contended that the malicious prosecution claim arose out of protected activity (the counterfeiting lawsuit filed in federal court), and that the Antounians could not establish that they had a prima facie case for malicious prosecution against Louis Vuitton/Dior and the lawyer defendants. The motions also invoked the district court's denial of the Antounians' motion for summary judgment as a demonstration that probable cause existed for the federal action. Finally, the motions argued that the Antounians had not shown malice or demonstrated that the federal lawsuit was terminated in their favor, as required for a malicious prosecution claim. The Antounians filed opposition briefs and Louis Vuitton/Dior and the lawyer defendants filed reply briefs.

After oral argument, the trial court granted the motions to strike in a ruling filed January 30, 2010. The court concluded that the malicious prosecution

---

[7] The complaint alleged a cause of action for intentional interference with prospective economic advantage against Kristopher Buckner and Karla L. Soules, Inc., doing business as Investigative Consultants, who were subsequently dismissed. The complaint also named as a defendant Burberry's lawyer, J. Andrew Coombs. This court granted the Antounians' motion to dismiss the appeal as to Coombs on October 15, 2009.

complaint fell within the purview of section 425.16, and that Louis Vuitton/Dior had probable cause to institute the federal action. The court also stated that the interim adverse judgment rule applied because the denial of the Antounians' motion for summary judgment demonstrated that the underlying federal action was not entirely lacking in merit, and the Antounians had not shown that the summary judgment motion was based on fraudulent or perjured evidence. The trial court also concluded that the Antounians had not shown malice, and that the underlying action was not terminated in the Antounians' favor. The trial court granted the lawyer defendants' motion to strike for the same reasons, noting that the Antounians had not demonstrated that under the circumstances there was no legally tenable basis for the lawyer defendants to continue with Louis Vuitton/Dior's lawsuit. The Antounians filed a timely notice of appeal under section 904.1, subdivision (a)(13).

## DISCUSSION

■ Section 425.16, known as the anti-SLAPP statute, authorizes the early dismissal of SLAPP actions; " 'SLAPP' is an acronym for 'strategic lawsuit against public participation . . . .' " (*Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1244, fn. 1 [49 Cal.Rptr.3d 861].) Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." The statute provides a method for summary disposition of meritless lawsuits intended " 'to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.]' " (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1015 [85 Cal.Rptr.3d 838].) The initial burden to show that the cause of action arises from protected activity is on the party moving to strike. (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1046 [79 Cal.Rptr.3d 822].) " 'Once that burden is met, the burden shifts to the opposing party to demonstrate the "probability that the plaintiff will prevail on the claim." ' " (*Ibid.*)

The Antounians' malicious prosecution complaint alleged that defendants wrongfully pursued the federal litigation, which is activity protected by the free speech and petition clauses. (See *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734–735 [3 Cal.Rptr.3d 636, 74 P.3d 737].) The Antounians do not dispute that the federal lawsuit was protected activity or that their malicious prosecution complaint falls within the reach of section 425.16. They argue instead that the trial court erred in determining that they did not carry their burden to show that they would prevail on the merits of

their claim that Louis Vuitton/Dior and the lawyer defendants were liable for malicious prosecution of the federal lawsuit. (See *Drummond v. Desmarais* (2009) 176 Cal.App.4th 439, 449 [98 Cal.Rptr.3d 183].)

We review de novo the trial court's grant of the anti-SLAPP motions to strike, independently reviewing the entire record to determine whether the Antounians have shown a probability of prevailing on the merits. (*Paiva v. Nichols, supra*, 168 Cal.App.4th at pp. 1016–1017.) To establish that their malicious prosecution lawsuit had a probability of success on the merits (and thus should have survived the anti-SLAPP motions to strike), the Antounians were required to show that they stated and substantiated a legally sufficient claim. " '[T]he plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 741.) We review the pleadings and the evidentiary submissions of the parties and, without weighing the credibility or comparative strength of the evidence, we affirm the trial court if, as a matter of law, Louis Vuitton/Dior and the lawyer defendants' evidence in support of their anti-SLAPP motions defeats the Antounians' attempt to establish support for their claims of malicious prosecution. (*Id.* at p. 741, fn. 10; *Drummond v. Desmarais, supra*, 176 Cal.App.4th at p. 449.)

*The Antounians have not shown a probability of prevailing on the merits of their malicious prosecution claim.*

■ "To establish a cause of action for malicious prosecution, a plaintiff must prove that the underlying action was (1) terminated in the plaintiff's favor, (2) prosecuted without probable cause, and (3) initiated with malice." (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 333 [109 Cal.Rptr.3d 143].) We first address the central element of probable cause, which is "a legal question to be resolved by the court." (*Plumley v. Mockett, supra*, 164 Cal.App.4th at p. 1047.)

A. *The Antounians have not shown that Louis Vuitton/Dior or the lawyer defendants lacked probable cause to bring the federal action.*

■ "The presence or absence of probable cause is viewed under an objective standard applied to the facts upon which the defendant acted in prosecuting the prior case. [Citation.] The test of determining probable cause is whether any reasonable attorney would have thought the claim to be tenable. [Citation.] . . . [¶] Hence, 'probable cause to bring an action does not depend on it being meritorious, as such, but upon it being *arguably tenable,*

i.e., not so completely lacking in apparant merit that no reasonable attorney would have thought the claim tenable. [Citation.]' " (*Paiva v. Nichols, supra,* 168 Cal.App.4th at pp. 1018–1019.) Probable cause exists if the claim is legally sufficient and can be substantiated by competent evidence. (*Id.* at p. 1021.) The Antounians do not argue that the federal complaint did not state legally sufficient claims, but that the claims were unsupported by any competent evidence.

The Antounians make the blanket statement that "[t]he investigative reports upon which [Louis Vuitton/Dior] and Lawyer Defendants based the Underlying Action were false." The Antounians point to confusion between the closely situated businesses; investigator Ortiz's errors in attributing activity at 1116 1/2 Santee Alley to Bijou Palace's address in her investigative reports of March 1 and May 26, 2006, and her correction of her April 27, 2006 investigative report during her trial testimony; and contradictions between some of the investigative reports. While three of investigator Ortiz's reports did misattribute counterfeiting activity to Bijou Palace, however, two of the mistakes were not known to Louis Vuitton/Dior and the lawyer defendants until after the filing of the amended complaint in December 2006, and one mistake (the Apr. 27, 2006 investigative report) was not known until trial.

In support of the motion to strike, Kenneth Klug, Louis Vuitton's director of criminal enforcement for North America, stated in a declaration that he had been involved in the investigation since he joined the company in July 2005, and at the time of the filing of the federal action in July 2006, he had received and reviewed the reports from Investigative Consultants regarding counterfeit Louis Vuitton merchandise at 1116 Santee Alley. At the time the complaint was filed, Louis Vuitton had a good faith belief that the Antounians participated in the sale of counterfeit Louis Vuitton merchandise. Even after Klug learned (after the filing of the amended complaint) of the mistakes in investigator Ortiz's reports of March 1, 2006, and May 26, 2006, he continued to believe that the Antounians were counterfeiting Louis Vuitton merchandise, based on the January 16, 2006, May 17, 2006, and June 24, 2006 investigative reports. Dior's vice-president and chief financial officer, Timothy de Chaisemartin stated in a declaration that Dior also believed in good faith that the Antounians were involved in counterfeiting at the time the federal complaint was filed. He had reviewed the investigative reports and based on the May 17, 2006 report (among other factors) he understood that the Antounians were selling counterfeit Dior merchandise. Arent Fox also learned of the mistakes after the filing of the amended complaint.

■ The evidence does not demonstrate that Louis Vuitton/Dior or the lawyer defendants knew the investigative reports were false at the time of

initiating the federal lawsuit. Whatever weaknesses in the evidence later came to light, the Antounians have not demonstrated the absence of probable cause to bring the federal action.

1. *The denial of the Antounians' summary judgment motion demonstrates that there was probable cause to bring the federal action.*

■ The interim adverse judgment rule holds that "victory at trial, though reversed on appeal, conclusively establishes probable cause to bring the underlying action." (*Plumley v. Mockett, supra,* 164 Cal.App.4th at p. 1052.) The rule has been extended to the denial of a defense motion for summary judgment. "Denial of a defense summary judgment motion on grounds that a triable issue exists . . . while falling short of a determination of the merits, establishes that the plaintiff has substantiated, or can substantiate, the elements of his or her cause of action with evidence that, if believed, would justify a favorable verdict. . . . [A] claimant or attorney who is in possession of such evidence has the right to bring the claim, even where it is very doubtful the claim will ultimately prevail." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 824 [123 Cal.Rptr.2d 19, 50 P.3d 733].) "Denial of a defendant's summary judgment motion provides similarly persuasive evidence that a suit does not totally lack merit. A federal judge denies summary judgment if there are 'genuine issues of material fact' for trial, and the moving party is not 'entitled to judgment as a matter of law.' (Fed. Rules Civ.Proc., rule 56(c), 28 U.S.C.) A California judge must reach similar conclusions to deny summary judgment. (Code Civ. Proc., § 437c, subd. (c).) These conclusions necessarily imply that the judge finds at least some merit in the claim. The claimant may win, if certain material facts are decided favorably. This finding (unless disregarded) compels conclusion that there is probable cause, because probable cause is lacking only in the *total absence* of merit." (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 383 [90 Cal.Rptr.2d 408].)

The opposition to the Antounians' summary judgment motion cited as evidence of trademark and copyright infringement the investigative reports of January 16, 2006, April 27, 2006, May 17, 2006,[8] and June 24, 2006. On the basis of this evidence, the district judge concluded "triable issues of fact remain with respect to the Antounians' involvement in the sale of counterfeit merchandise bearing Louis Vuitton and Christian Dior trademarks and copyrights." Such a "denial of defendant's summary judgment in an earlier case

---

[8] We refer to this report by the date that investigator Ortiz observed the counterfeit merchandise, May 17, 2006, rather than the date that her supervisor, Kristopher Buckner, prepared the report (May 22, 2006).

normally establishes there was probable cause to sue, thus barring a later malicious prosecution suit." (*Roberts v. Sentry Life Insurance, supra*, 76 Cal.App.4th at p. 384.)

### 2. *The fraud exception does not apply.*

As the Court of Appeal cautioned in *Roberts v. Sentry Life Insurance*, "We say 'normally' rather than 'conclusively' because there may be situations where denial of summary judgment should not irrefutably establish probable cause. For example, if denial of summary judgment was induced by materially false facts submitted in opposition, equating denial with probable cause might be wrong. Summary judgment might have been granted but for the false evidence." (*Roberts v. Sentry Life Insurance, supra*, 76 Cal.App.4th at p. 384.) The Antounians argue that the fraud exception applies, because investigator Ortiz's trial testimony shows that her April 27, 2006 investigative report was false.

Investigator Ortiz's April 27, 2006 investigative report stated that at the business "Bijou" there were three people, two men and "Gaby," running a "booth." Investigator Ortiz observed Louis Vuitton handbags and wallets, and one Dior wallet, that appeared to be counterfeit. Investigator Ortiz asked Gaby for a Dior handbag, and Gaby sent one of the men to get a handbag, which investigator Ortiz purchased for $38. Investigator Ortiz was unable to see where the man went to get the Dior handbag.

In her March 30, 2007 declaration in support of the opposition to the Antounians' summary judgment motion, investigator Ortiz stated that on April 26, 2006, or April 27, 2006, she spoke on the telephone to Gaby, who "told me that she would be at '1116 Bijou' that day and that she hoped I would come and see her," which investigator Ortiz understood to mean Bijou Palace. When she arrived, Gaby met her "at the Bijou Palace shop" and "had a rack of merchandise leaning up against the outside wall between the Bijou Palace shop, at 1116 Santee Alley, and the shop next door at 1114 1/2 Santee Alley." Investigator Ortiz observed the counterfeit Louis Vuitton and Dior merchandise on the rack, which Gaby was monitoring. Investigator Ortiz described her purchase of a Dior handbag and repeated that she did not see where the Dior handbag came from. She also described Gaby telling the same man, who was fixing a belt buckle display outside Bijou Palace, to get her a handbag. The man went inside Bijou Palace to get another handbag inside a black bag and pulled it out of the bag to give it to Gaby to sell. The man was a "runner" whom investigator Ortiz had seen working with Gaby to sell counterfeit handbags on numerous occasions.

At trial on July 12, 2007, investigator Ortiz testified at cross-examination that on April 27, 2006, "I made a purchase, but not from Bijou." Investigator

Ortiz explained that in her reports she would list outside items by "which [store] it's closer to or which one it goes into." She viewed a videotape of that day and concluded that the rack monitored by Gaby was closer to 1114 1/2 Santee Alley than to Bijou Palace, at 1116 Santee Alley ("I thought it was 1116. But, in fact, you know, it's 1114 and a half."). Investigator Ortiz stated that she learned of the mistake after she signed her March 30, 2007 declaration, while viewing the videotapes in preparation for trial. She informed her boss, Kristopher Buckner, and Gargiulo of the mistake. She did not remember making a correction in writing.

Investigator Ortiz disavowed her April 27, 2006 investigative report and her summary judgment declaration, to the extent that both attributed the rack holding Louis Vuitton and Dior counterfeit merchandise to Bijou Palace, rather than to the store next door to Bijou Palace. She did not disavow her other observations in the report or her other statements in the declaration. Even if the entire report was false, however, her April 27, 2006 report and that portion of investigator Ortiz's summary judgment declaration were not the only evidence that counterfeit activity occurred at the Antounians' Bijou Palace store at 1116 Santee Alley. The April 27, 2006 report was one of four linking counterfeit Louis Vuitton and Dior merchandise to Bijou Palace. The three remaining reports were sufficient to create a triable issue of material fact.[9] Because those additional reports were not shown to be false, the Antounians have not demonstrated that the district court would have granted summary judgment "but for" the April 27, 2006 report alone. (*Roberts v. Sentry Life Insurance, supra,* 76 Cal.App.4th at p. 384.)

Further, the fraud exception requires " 'knowing use of false and perjured testimony.' " (*Plumley v. Mockett, supra,* 164 Cal.App.4th 1031, 1053.) There is no evidence that investigator Ortiz knowingly falsified her April 27, 2006 investigative report. She testified that she realized her mistake while preparing for trial and after signing her summary judgment declaration. The Antounians do not cite any evidence that either Louis Vuitton/Dior or the lawyer defendants knew the April 27, 2006 investigative report and the declaration were false at the time they filed the opposition to the Antounians' summary judgment motion.[10] The Antounians have not demonstrated that the district court's denial of the summary judgment motion was obtained by the knowing use of false testimony.

---

[9] The January 16, 2006 investigative report concerned counterfeit Louis Vuitton handbags. The May 17, 2006 investigative report concerned counterfeit Louis Vuitton handbags and wallets and Dior handbags and wallets. The June 24, 2006 report concerned counterfeit Louis Vuitton jewelry. The remaining reports thus were evidence of counterfeit merchandise from both Louis Vuitton and Dior.

[10] Gargiulo stated in a declaration in support of the motion to strike that she did not learn of Ortiz's trial testimony that the April 27, 2006 report was incorrect until after the filing of the malicious prosecution action, and that while she was working on the case she did not know it.

B. *The Antounians have not shown that the lawyer defendants or Louis Vuitton/Dior lacked probable cause to continue prosecution of the lawsuit.*

The Antounians argue that even if Louis Vuitton/Dior and the lawyer defendants had probable cause to file the lawsuit, they did not have probable cause to continue to prosecute it after the inaccuracies in some of the investigative reports became clear.

"Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset. [Citation.]" (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 969 [12 Cal.Rptr.3d 54, 87 P.3d 802].) "[W]e conclude an attorney may be held liable for malicious prosecution for continuing to prosecute a lawsuit discovered to lack probable cause." (*Id.* at p. 970.) In *Paiva v. Nichols*, the Court of Appeal noted "*Zamos* only held that attorneys may be liable for malicious prosecution if they continue to maintain a suit that they learn after its filing to be meritless. The case said nothing about such malicious prosecution liability for party-litigants." (*Paiva v. Nichols, supra*, 168 Cal.App.4th at p. 1030, fn. omitted.) Observing that "the roles of attorney and client in litigation are very different," the Court of Appeal stated "we can envision numerous scenarios in which only the attorney may become chargeable with knowledge (postfiling) of new or different facts or law that render objectively untenable a lawsuit that was filed with probable cause." (*Id.* at pp. 1030–1031.) Nevertheless, the court concluded "we believe that, extending the reasoning of *Zamos*, there are circumstances under which a nonattorney client who has probable cause to file suit may be chargeable with the subsequent knowledge of facts—and thereby be potentially liable for malicious prosecution—that result in the case being not objectively tenable." (*Id.* at p. 1031.) The Court of Appeal addressed the claim that the parties' continued prosecution of the lawsuit constituted malicious prosecution, despite "the uncertainty of the extent to which the principle in *Zamos* applies to nonattorney clients as well as attorneys." (*Ibid.*)

Like the Court of Appeal in *Paiva v. Nichols, supra*, 168 Cal.App.4th 1007, we believe that there may be situations in which a client, as well as an attorney, can be liable for malicious prosecution when a lawsuit initiated with probable cause later is discovered—because of new facts, or a change in the law—not to have even a tenable basis, and thus becomes a meritless action without probable cause. We are not confronted with such a situation here, however, because we conclude that probable cause existed throughout.

As described above, the discrediting of some of the investigative reports regarding Bijou Palace did not render the lawsuit against the Antounians

untenable. Even after investigator Ortiz acknowledged the mistakes in her investigative reports of March 1, 2006, and May 26, 2006, and testified at trial that the April 27, 2006 report incorrectly attributed a rack holding counterfeit Louis Vuitton and Dior merchandise to Bijou Palace, three investigative reports remained which attributed to the Antounians' store counterfeit merchandise from both companies. Investigator Ortiz's acknowledged mistakes were not "new fact[s] that essentially *transformed* the prior suit from one [the parties] had probable cause to initiate into one that was objectively without merit." (*Paiva v. Nichols, supra*, 168 Cal.App.4th at p. 1033.) Investigator Ortiz's errors weakened defendants' case, but did not leave it without any basis. "Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit." (*Zamos v. Stroud, supra*, 32 Cal.4th at p. 970.)

The Antounians acknowledge that evidence of counterfeiting remained, but argue "[t]he patent unreliability of the investigation vitiates any reasonable reliance by the Defendants on even the handful of investigative reports the investigators did not specifically recant." The Antounians also argue that the "cherry-picked" reports had no corroborating evidence and that there were contradictions in the reports and declarations. The lack of receipts or other corroborating evidence, and any contradictions between individual items of evidence, might serve as fertile sources for the Antounians to challenge defendants' case at trial, as already occurred in the cross-examination of Investigator Ortiz during which she explained her mistake in the April 27, 2006 investigative report. The weaknesses in the evidence do not, however, result in a lawsuit completely and totally without merit.

## C. *The Antounians have not shown malice.*

The Antounians argue that Louis Vuitton/Dior and the lawyer defendants initiated and prosecuted the lawsuit with malice, because they knew all the counterfeiting evidence against the Antounians was false. We need not determine whether the Antounians proved malice, as resolution of that factual issue is unnecessary to the disposition of this appeal. "Since this appeal may be resolved by determining the legal question of probable cause, we need not address whether [the party claiming malicious prosecution] presented sufficient evidence to support a finding [of malice] ordinarily reserved for the trier of fact . . . ." (*Paiva v. Nichols, supra*, 168 Cal.App.4th at p. 1019, fn. 6; see *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 874 [254 Cal.Rptr. 336, 765 P.2d 498] [malice element of malicious prosecution claim relates to subjective intent, and is a question of fact].) "Only if the court determines that such *objective* tenability is absent, will the jury be asked to determine the presence or absence of malice," which is a subjective state of mind. (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498 [78 Cal.Rptr.2d

142].) Thus, "if the underlying claims were objectively tenable, the malicious prosecution claim fails, regardless of any evidence of malice on the part of the defendant." (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP, supra,* 184 Cal.App.4th at p. 333.)

█ We nevertheless point out that the Antounians have failed to show malice. The Antounians argue that lack of probable cause alone is sufficient to show malice, and that Louis Vuitton/Dior and the lawyer defendants must have filed and prosecuted the case without believing in the evidence. This argument has been rejected. " 'Merely because the prior action lacked legal tenability, as measured objectively[,] . . . *without more,* [this] would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind.' " (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 743.) Even if the Antounians had shown that the lawsuit was not tenable (that is, filed and prosecuted without probable cause), more would have been required for a showing that the lawsuit was initiated and prosecuted with malice. Certainly—given that there *was* probable cause to institute and prosecute the lawsuit—their malice argument fails.

### D. *The underlying action was not terminated in the Antounians' favor.*

The trial court did not expressly find that the Antounians showed that the underlying federal action was terminated in their favor, instead stating only that "the fact that Plaintiffs were voluntarily dismissed *may* constitute favorable termination in their favor for purposes of a malicious prosecution claim" (italics added). In their opening brief, beyond citing this portion of the trial court's opinion as a finding that they had met their burden to establish favorable termination, the Antounians made no argument regarding favorable termination. Ordinarily, an argument not raised in the opening brief is forfeited on appeal. (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [67 Cal.Rptr.2d 350].) Further, to establish malicious prosecution a plaintiff must separately show both favorable termination and a lack of probable cause. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 743, fn. 13.) Our conclusion that probable cause existed throughout the federal action dooms the Antounians' argument that they showed a probability of prevailing on their malicious prosecution claim, and therefore it is unnecessary to determine whether they also showed favorable termination. We generally do not address issues whose resolution is unnecessary to the disposition of an appeal. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845, fn. 5 [57 Cal.Rptr.3d 363]; see *Palermo v. Stockton Theaters, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].)

■ We note, however, that the evidence in this case does not support a conclusion that the voluntary dismissal was a favorable termination. " 'If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious prosecution.' " (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1399 [69 Cal.Rptr.3d 561].) " ' "[W]hen the underlying action is terminated in some manner other than by a judgment on the merits, the court examines the record 'to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed.' " [Citations.]' " (*Ibid.*) In this case, the federal district court noted that the Antounians had threatened to bring a malicious prosecution action, and expressly stated that although it was conditioning the dismissal on the payment of a portion of the Antounians' attorney's fees, "the Court makes no findings concerning the relative merits of the parties' claims and defenses. Nor does the Court intend for this Order to have any effect on future litigation between the parties." The district court's disposition explicitly did not reflect any opinion on the merits of the federal action. The voluntary dismissal "reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827, fn. 4 [145 Cal.Rptr. 829].)

There was evidence in the trial court that the dismissal was for tactical reasons: (1) counterfeit goods no longer were offered for sale at Bijou Palace, and (2) the Antounians were the only remaining retailer defendants, so that their dismissal allowed the trial to focus on the landlord defendants. Louis Vuitton/Dior had decided to dismiss the claims in late February or early March 2007, and offered to dismiss them voluntarily in a letter dated March 2, 2007, before the Antounians filed their summary judgment motion, but the parties continued to negotiate after the Antounians objected to dismissal unless all their attorney's fees were paid.

Further, the award of fees does not require us to conclude that the voluntary dismissal terminated the federal action in the Antounians' favor. Under Federal Rules of Civil Procedure, rule 41(a)(2) (28 U.S.C.), "[W]hen ruling on a motion to dismiss without prejudice, the district court must determine whether the defendant will suffer some plain legal prejudice as a result of the dismissal." (*Westlands Water Dist. v. U.S.* (9th Cir. 1996) 100 F.3d 94, 96.) "Although case law does not articulate a precise definition of 'legal prejudice,' the cases focus on the rights and defenses available to a defendant in future litigation." (*Id.* at p. 97.) The expense of defending against a lawsuit is not legal prejudice, but if the district court chooses, it may protect the defendants' interests by conditioning the dismissal upon the payment of

attorney's fees and costs. (*Ibid.*) "[T]he defendants should only be awarded attorney fees for work which cannot be used in any future litigation of these claims." (*Ibid.*)

The district court's award of attorney's fees thus was not a statement that the dismissal was on the merits. Rather, the court exercised its discretion under Federal Rules of Civil Procedure, rule 41(a)(2) (28 U.S.C.), to protect the Antounians' interests by conditioning dismissal on the payment of attorney's fees. The court explicitly excluded fees for the Antounians' "misguided" summary judgment motion and for any work that could be used in a malicious prosecution action. The district court added that the fee award was *not* a finding on the relative merits of the parties' claims and defenses, and should not "have any effect on future litigation between the parties." This language demonstrates that the voluntary dismissal conditioned on Louis Vuitton/Dior's payment of some of the Antounians' attorney's fees was not a "favorable termination" for the Antounians.

We conclude that the Antounians' claims were properly subject to a special motion to strike, and the Antounians failed to carry their burden of showing a probability of prevailing on those claims.

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

Mallano, P. J., and Chaney, J., concurred.