Filed 10/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MINA LITINSKY, | B293968 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC713781) |
| v. | |
| JAYNE KAPLAN, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County. Joseph Kalin, Judge. (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Law Office of Leslie S. McAfee and Leslie S. McAfee for Plaintiff and Appellant.

Nemecek & Cole, Michael McCarthy, Mark Schaeffer and Vikram Sohal for Defendant and Respondent.

_____

Mina Litinsky appeals from an order striking her claims against respondent Jayne Kaplan under Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1]

Litinsky was the defendant in a prior lawsuit in which Kaplan, an attorney, represented the plaintiff. Following the dismissal of that lawsuit, Litinsky sued Kaplan for malicious prosecution and intentional infliction of emotional distress, along with similar claims against Kaplan's former client and others.[2]

The trial court granted Kaplan's motion to strike both of the claims against her. Because the claims arose from Kaplan's prosecution of the prior lawsuit, they met the first requirement under the anti-SLAPP statute to show protected free speech or petitioning activity. Litinsky was therefore required to show a likelihood that she would succeed on her claims, which she failed to do. Her claim for intentional infliction of emotional distress was precluded by the litigation privilege (Civ. Code, § 47). And her claim for malicious prosecution could not succeed because the evidence showed that Kaplan had probable cause to prosecute the prior lawsuit against Litinsky on behalf of Kaplan's client.

We affirm. The only issue that Litinsky raises in this appeal is the viability of her malicious prosecution claim. We agree with the trial court that Kaplan had sufficient evidence of the potential merit of her client's claims to meet the probable

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure. "SLAPP" is an acronym for "[s]trategic lawsuit against public participation." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.)

[2] Kaplan brought the anti-SLAPP motion at issue in this appeal on her own behalf. She is the only respondent on appeal.

cause requirement. The evidence came primarily from her client. While that evidence was contradicted by testimony from the opposing party and some third parties, it was not indisputably false. Faced with the choice of accepting the version of events presented by her client or the version described by the opposing party, Kaplan appropriately opted to continue advocating for her client. She could not be liable for malicious prosecution for making that choice so long as the client's claims were arguably meritorious.

## BACKGROUND

### 1. The Prior Lawsuit

In December 2016, Kaplan filed an action in Los Angeles Superior Court for fraud against Litinsky on behalf of Vadim Harutyunov. The complaint alleged that in 2004 Litinsky had promised to pay Harutyunov a 10 percent commission on purchases of art by persons whom Harutyunov referred to Litinsky's art gallery in Denver, Colorado. Harutyunov had allegedly referred a customer named Armen Petrosyan to Litinsky's gallery. Harutyunov claimed that he first learned in 2015 that Petrosyan had purchased art from Litinsky on which a commission was owed.

Before filing the action, Kaplan was given and reviewed a document purporting to be a written agreement between Harutyunov and Litinsky memorializing the 10 percent commission arrangement (the Commission Agreement). The Commission Agreement contained the signatures of Litinsky and Harutyunov, as well as a signature by an attorney, Thomas E. Kent, approving the agreement "as to form." The Commission Agreement stated that it was for the period from June 28, 2004, to June 28, 2019, and renewable thereafter unless terminated.

3

The copy of the agreement that Kaplan was given contained a header indicating that it had been faxed on June 28, 2004, from a telephone number with a Colorado area code.

After Litinsky was served with the complaint, she filed a motion to quash on the grounds of forum non conveniens and lack of personal jurisdiction. Kaplan filed an opposition to the motion supported by declarations from both Harutyunov and Petrosyan. In his declaration, Harutyunov confirmed that Litinsky had entered into an agreement with him to pay "a fee for introducing purchasers" and testified that the agreement had been memorialized in a written contract drafted by Harutyunov's lawyer. Petrosyan testified that he participated in a three-way telephone conversation with Litinsky and Harutyunov in which Harutyunov introduced him as a prospective purchaser.

In reply, Litinsky filed a declaration denying that she had signed the Commission Agreement and denying that she had ever met or even heard of Harutyunov.

The court denied Litinsky's motion to quash, finding "sufficient minimum contacts supporting specific jurisdiction." The court found "substantial evidence that Litinsky made numerous shipments to California to an individual who states that [Harutyunov] introduced him to Litinsky." The court concluded that "[t]he evidence indicates Litinsky purposefully availed herself of the benefits of the forum by repeatedly doing business with California residents, shipping art to California, as well as discussions with California residents relating to the transactions at issue in this action."

The action proceeded to discovery. In discovery responses, Litinsky again denied entering into the Commission Agreement. She stated that her gallery did not own a fax machine at the time

4

that the Commission Agreement was purportedly faxed from the Colorado number in the header of the agreement. She explained that the identified number was actually the telephone number for her gallery rather than for a fax machine.

In stark contrast, Harutyunov served verified discovery responses confirming that he had entered into the Commission Agreement with Litinsky. At his deposition, Harutyunov testified that Kent was his attorney; Kent had drafted the Commission Agreement; and Kent sent the agreement to Litinsky, who signed it and returned it.

Trial in the prior lawsuit was scheduled for February 26, 2018. Shortly before trial Kaplan filed an ex parte application to continue the trial, which the court granted, on the ground that Harutyunov had recently undergone heart surgery. Trial was rescheduled for July 2, 2018.

Shortly before the rescheduled trial date, Kaplan filed another ex parte request for a continuance on the ground that Harutyunov was still too ill to participate. The court denied the request. Following the denial, on the date set for trial, Kaplan filed a request for dismissal.

## 2. Kaplan's Anti-SLAPP Motion

Litinsky filed this action on July 13, 2018, against Kaplan; Harutyunov and his wife; and Petrosyan and his wife. The complaint asserted claims against Kaplan for malicious prosecution and intentional infliction of emotional distress.

Kaplan filed a motion to strike the two claims against her under section 425.16. The motion was based on the grounds that: (1) Litinsky's claims against her arose from a prior lawsuit, which is petitioning activity that is protected under section 425.16, subdivision (e); and (2) Litinsky could not establish a probability

5

of success on her claims. Kaplan argued that Litinsky's claim for intentional infliction of emotional distress was barred by the litigation privilege under Civil Code section 47. With respect to Litinsky's malicious prosecution claim, Kaplan argued that: (1) Harutyunov's voluntary dismissal of the prior action was not a favorable termination on the merits; (2) Kaplan had probable cause to file and prosecute the prior action; and (3) Kaplan did not act with malice.

### A. *Kaplan's evidence*

In her declaration in support of her motion, Kaplan described the facts on which she relied for probable cause to prosecute the action against Litinsky. She explained that she could not reveal her privileged communications with Harutyunov. However, she pointed out that: (1) Harutyunov had testified at his deposition that the Commission Agreement was genuine; (2) Harutyunov and Petrosyan had provided declarations in response to Litinsky's motion to quash, attesting to the validity of the Commission Agreement with Litinsky; (3) the trial court had denied Litinsky's motion in an order that seemed to give credence to the Harutyunov and Petrosyan declarations; (4) Petrosyan had provided copies of invoices from Litinsky's gallery that contained a fax header with the same number as the fax line on the Commission Agreement; and (5) Kaplan had retained an expert who was prepared to testify that the fax header on the Commission Agreement was genuine.

Kaplan also supported her motion with exhibits, which included: (1) the filings from the motion to quash; (2) discovery responses; (3) the invoices from Petrosyan bearing the same fax header as the Commission Agreement; (4) her expert's curriculum vitae; and (5) correspondence with Litinsky's counsel.

6

## B. *Litinsky's evidence*

In support of her opposition, Litinsky provided her own declaration, denying that she had ever heard of Harutyunov prior to the litigation. She testified that she had sold art works to Petrosyan, who had then resold them to another person (Raskin) at very high, above market prices. Raskin successfully sued Petrosyan for fraud, and Litinsky was a witness in that litigation. Petrosyan was upset and threatened her.

Although Litinsky had not signed the Commission Agreement, she recognized the signatures on the agreement as her own. She examined invoices that she had prepared for Petrosyan and concluded that her signature on those invoices were identical to her signature on the Commission Agreement. She denied that her gallery owned a fax machine in 2004 when the Commission Agreement was signed.

Litinsky's counsel, Leslie McAfee, also submitted a declaration, describing information that he had provided to Kaplan to show that the Commission Agreement was fraudulent. In his first conversation with Kaplan, McAfee advised Kaplan that Litinsky had been a witness in the fraud lawsuit against Petrosyan, and that Harutyunov was a "cousin or close family member" of Petrosyan.[3] During discovery, McAfee also advised

---

[3] In an apparent contradiction, McAfee also testified that, at the time of this conversation, he was "unaware of the familial relationship" between Harutyunov and Petrosyan. In another apparent contradiction, McAfee stated in his declaration that, during this initial conversation with Kaplan, Kaplan "denied any knowledge of Armen Petrosyan" but also said that her client had " 'just discovered' the sales of art to Armen [Petrosyan] (and his

Kaplan of three witnesses who confirmed that Litinsky's gallery did not own a fax machine in 2004. One of those witnesses was deposed. Although Kaplan did not attend the deposition, McAfee sent Kaplan a copy of the transcript.

McAfee retained a forensic document specialist, Frank Hicks, who was prepared to offer the opinion that Litinsky's signatures on the Commission Agreement were identical to her signatures on invoices to Petrosyan and had apparently been copied from those invoices. Hicks also was prepared to testify that the fax header on the Commission Agreement was crooked and misaligned from page to page, showing that it had been copied from another source. McAfee testified that he "conveyed to Ms. Kaplan all of Mr. Hicks' expert opinions and the bases for his opinions."

McAfee also hired an investigator who located Kent, the lawyer who had purportedly drafted the Commission Agreement. Kent told McAfee that he did not draft or sign the agreement. Kent provided McAfee with a declaration attesting to those facts. The declaration stated that he first met Harutyunov in 2014 or 2015, ten years after the agreement was signed, when Kent was working as a paralegal for another attorney.[4] McAfee testified

wife, Anna) in 2015." The contradictions are not material to this appeal. Consistent with the rule that a court does not resolve factual conflicts in ruling on an anti-SLAPP motion, we accept McAfee's testimony that at some point he advised Kaplan of the theory that Harutyunov fabricated his claim against Litinsky in retaliation for Litinsky's prior testimony against Petrosyan.

[4] Litinsky filed Kent's declaration in support of her opposition to Kaplan's anti-SLAPP motion.

that he "made the content of Kent's declaration known to Kaplan around the first of 2018."

### 3.    The Trial Court's Ruling

The trial court found that Litinsky's claims against Kaplan arose from protected petitioning activity under section 425.16, subdivision (e).  With respect to Litinsky's showing on the merits, the court concluded that Litinsky's claim for intentional infliction of emotional distress was barred by the litigation privilege.[5]

With respect to the malicious prosecution claim, the court found that there was sufficient evidence to provide probable cause for maintaining the prior action against Litinsky.  The court concluded that, "[w]hile perhaps [Kaplan's] evidence was weak, there was not a total lack of evidence supporting the authenticity of the [C]omission [A]greement.  In other words, the Court cannot say that any reasonable attorney would agree the action lacked merit."  The court therefore granted the anti-SLAPP motion and ordered the claims against Kaplan struck.

## DISCUSSION

### 1.    The Anti-SLAPP Procedure

Section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)  Such claims must be struck "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (*Ibid*.)

---

[5] Litinsky does not challenge either of these rulings on appeal.

9

Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the "moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) At this stage, the defendant must make a "threshold showing" that the challenged claims arise from protected activity. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.)

Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, *supra,* 1 Cal.5th at p. 396.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid*.) The plaintiff's showing must be based upon admissible evidence. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) The court "considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*).) Thus, the second step of the anti-SLAPP process "establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

An appellate court applies a de novo standard of review to the grant or denial of an anti-SLAPP motion. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

Litinsky's malicious prosecution claim arises from the prior lawsuit that Kaplan prosecuted against her. She does not dispute that this prior lawsuit amounted to petitioning activity that is protected under section 425.16, subdivision (e). Thus, on this appeal we consider only the second step of the anti-SLAPP procedure as applied to Litinsky's claim.

## 2. Malicious Prosecution and the Attorney-client Relationship

To establish a cause of action for malicious prosecution, "a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].'" (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 (*Sheldon Appel*), quoting *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50.) Our Supreme Court has explained that "[a]lthough the malicious prosecution tort has ancient roots, courts have long recognized that the tort has the potential to impose an undue 'chilling effect' on the ordinary citizen's willingness to report criminal conduct or to bring a civil dispute to court, and, as a consequence, the tort has traditionally been regarded as a disfavored cause of action." (*Sheldon Appel,* at p. 872.)

In *Sheldon Appel,* the court adhered to these "traditional limitations on malicious prosecution recovery" in defining the probable cause element of the tort. (*Sheldon Appel, supra,* 47

11

Cal.3d at pp. 873–874.)  The court explained that analyzing whether probable cause existed for a prior lawsuit "calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable." (*Sheldon Appel, supra,* 47 Cal.3d at p. 878.)  Whether a claim was legally tenable is determined by applying the same standard that governs whether an appeal is frivolous:  The question is "whether any reasonable attorney would have thought the claim tenable." (*Id.* at pp. 885–886, citing *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)  The court concluded that this standard would best reflect "the important public policy of avoiding the chilling of novel or debatable legal claims." (*Sheldon Appel,* at p. 885.)

Additional policies come into play when a malicious prosecution action is brought against a *lawyer* who prosecuted a prior action.  Unless a lawyer discovers that his or her client has provided false information, the lawyer is generally entitled to rely on information from his or her client in filing or prosecuting a lawsuit.  (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 223 (*Daniels*).)  That reliance is grounded on the attorney's duty to act as an advocate on behalf of his or her client.  (See *Marijanovic v. Gray, York & Duffy* (2006) 137 Cal.App.4th 1262, 1272, fn. 5 (*Marijanovic*) [noting that "it could well constitute malpractice for an attorney to drop a lawsuit, for which supporting evidence existed, merely because opposing counsel asserted the action was baseless"].)

Whether there was probable cause for a prior lawsuit is ultimately a question of law for the court to decide.  (*Sheldon Appel, supra,* 47 Cal.3d at p. 881.)  Where there is a dispute

about the defendant's knowledge and "the existence of probable cause turns on resolution of that dispute," a jury must resolve the "threshold question of the defendant's factual knowledge or belief." (*Ibid.*) However, "when the state of the defendant's factual knowledge is resolved or undisputed, it is the court which decides whether such facts constitute probable cause or not." (*Ibid.*)

### 3. Litinsky Failed to Show that Kaplan Lacked Probable Cause to Prosecute Her Client's Claim

#### A. *The trial court correctly analyzed the evidence of probable cause under the rules governing the second step of the anti-SLAPP procedure*

Litinsky makes several arguments attacking the process the trial court used to evaluate the evidence of probable cause. Our review is de novo, and we therefore need not defer to the trial court's analysis. We nevertheless address Litinsky's arguments to dispel several procedural misconceptions on which they are based.

Litinsky first argues that it is a question of fact whether the evidence of fraud that she submitted in support of her opposition to Kaplan's anti-SLAPP motion established "*unequivocal* evidence for Kaplan to doubt the credibility of her client." Litinsky claims that the "very existence of this factual assertion in the opposition to the anti-SLAPP motion was a sufficient showing . . . to defeat the motion."

This argument is wrong for two reasons. First, it incorrectly assumes that whether the evidence was "unequivocal" in showing that Kaplan's client was lying was an issue for the jury. Unequivocal evidence of fraud is another way of saying that

13

no reasonable attorney would have believed that Harutyunov had a legitimate claim. As mentioned, the existence of probable cause is an issue of law that the court decides. The trial court could not resolve disputed issues of fact in ruling on Kaplan's anti-SLAPP motion, but it could, and properly did, decide issues of law based upon the facts presented to it, while accepting as true the admissible evidence that Litinsky presented for purposes of the motion. (*Wilson, supra*, 28 Cal.4th at p. 821; *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.)

Second, the argument assumes that the evidence of fraud was "unequivocal" if the only evidence contradicting it was the testimony of Kaplan's client. That is incorrect.

As discussed above, a lawyer is generally entitled to rely on information from his or her client. (*Morrison v. Rudolph* (2002) 103 Cal.App.4th 506, 512–513 (*Morrison*).) A lawyer may not do so if he or she *knows* the client is not telling the truth, but a lawyer is not charged with such knowledge simply because an opposing party offers evidence of a different version of events. As discussed below, Kaplan had evidence suggesting that *Litinsky* might be lying in denying that she entered into the Commission Agreement. While not overwhelming, that evidence was sufficient to create a possibility of success.

Faced with competing versions of the facts offered by Litinsky and Harutyunov, Kaplan could accept Harutyunov's version, even if she thought Litinsky was more likely to prevail. As our Supreme Court has explained, "A litigant or attorney who possesses competent evidence to substantiate a legally cognizable claim for relief does not act tortuously by bringing the claim, even if also aware of evidence that will weigh against the claim. Plaintiffs and their attorneys are not required, on penalty of tort

14

liability, to attempt to predict how a trier of fact will weigh the competing evidence, or to abandon their claim if they think it likely the evidence will ultimately weigh against them.  They have the right to bring a claim they think unlikely to succeed, so long as it is arguably meritorious."  (*Wilson, supra,* 28 Cal.4th at p. 822.)

Litinsky also suggests that the trial court erred by even considering the evidence Kaplan submitted.  Litinsky argues that "the facts set forth by [Litinsky] in opposition to the anti-SLAPP necessarily were at issue and NOT the claimed facts known by Kaplan.  If the facts asserted by [Litinsky] in opposition to the anti-SLAPP would, if credited, support her claim that the continued prosecution lacked probable cause, then [Litinsky] had met her burden in defeating the anti-SLAPP motion."

Litinsky is correct that factual conflicts between her evidence and Kaplan's evidence must be resolved in Litinsky's favor.  But the trial court was not required to disregard Kaplan's evidence where no such conflict existed.  To the contrary:  In ruling on an anti-SLAPP motion, a trial court is to consider the evidentiary submissions "of both the plaintiff and the defendant." (*Wilson, supra,* 28 Cal.4th at p. 821; see § 425.16, subd. (b)(2) ["the court shall consider the pleadings, and supporting and opposing affidavits"].)  Thus, a court may accept uncontradicted factual assertions in a moving party's declarations.  (Cf. *Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 636 [a moving party's uncontradicted declarations, even if self-serving, may provide the basis for summary judgment].)

For example, for purposes of Kaplan's anti-SLAPP motion we must accept Litinsky's testimony that she did not sign the Commission Agreement and she did not fax a copy of the

15

agreement to Kent or Harutyunov. However, the trial court could also accept Kaplan's uncontradicted testimony that she had invoices from Litinsky's gallery that contained the same fax number as the copy of the Commission Agreement, and that Harutyunov consistently maintained that the Commission Agreement was genuine. Thus, for purposes of the anti-SLAPP motion, the trial court could both accept Litinsky's claim that the Commission Agreement was *actually* fraudulent and also accept Kaplan's testimony concerning the facts she knew indicating that the agreement *might* be genuine.

B. ***The evidence available to Kaplan showed that her client's claim was arguably meritorious***

Kaplan provided uncontradicted evidence that:
(1) Harutyunov testified in a declaration submitted in opposition to Litinsky's motion to quash service of process that he had entered into the Commission Agreement with Litinsky;
(2) Harutyunov similarly stated under oath in discovery responses and during his deposition that he had entered into the Commission Agreement with Litinsky and had referred Petrosyan to her gallery; (3) Petrosyan provided Kaplan with invoices from Litinsky's gallery concerning his purchases;[6]
(4) some of those invoices showed that they were faxed from the same number that appeared on a fax line on the Commission Agreement; (5) Petrosyan submitted a declaration in opposition to Litinsky's motion to quash stating that Harutyunov introduced

---

[6] In fact, there is no dispute that Petrosyan actually did make purchases from Litinsky's gallery.

16

him to Litinsky during a three-way telephone conversation with Litinsky before he purchased art from her; and (6) Kaplan had retained an expert witness who was prepared to testify that the fax headers on the Commission Agreement were genuine.[7] Although hardly overwhelming in light of the evidence supporting Litinsky's version of events, this evidence was at least sufficient to show that a jury might ultimately believe Harutyunov rather than Litinsky.

Citing *Arcaro v. Silva & Silva Enterprises Corp.* (1999) 77 Cal.App.4th 152 (*Arcaro*), Litinsky argues that Kaplan lacked probable cause to prosecute Harutyunov's lawsuit against her because Litinsky provided Kaplan with "uncontroverted, verifiable evidence" that the signatures of Litinsky and Kent on the Commission Agreement were fraudulent. In *Arcaro,* an accountant's former client forged the accountant's signature and used the accountant's social security number to obtain a credit line with a hardware store. (*Id.* at p. 154.) When the store's collection agency (Hammer) attempted to collect from the accountant on an outstanding debt, the accountant, Arcaro, told Hammer that the signature on the account was not his and identified the person who likely had forged it. After Hammer filed suit against Arcaro, Arcaro's attorney offered handwriting exemplars to prove the fraud. The lawsuit was later dismissed,

---

[7] Litinsky asserts that Kaplan's expert was not qualified to offer that opinion. However, the expert's curriculum vitae shows research experience in the history of fax machines and "fraudulent and frothy firms in emerging technologies." Litinsky cites no evidence supporting the conclusion that the expert would have been precluded from offering an opinion at trial.

17

and Arcaro sued successfully for malicious prosecution. (*Id.* at pp. 155–156.)

On appeal, the court affirmed the trial court's finding that Hammer lacked probable cause to file its action against Arcaro. The court noted that Arcaro had denied that he signed the credit agreement and also provided the name of the person who likely had forged his signature along with an explanation for how that person had acquired Arcaro's personal information. (*Arcaro, supra,* 77 Cal.App.4th at p. 157.) Arcaro further provided exemplars of his signature that "no reasonable person" could conclude resembled the signature on the credit application. (*Ibid.*) The court concluded that Hammer lacked probable cause to file the action against Arcaro because it had no evidence that would permit it to prevail on its burden to authenticate Arcaro's signature. (*Id.* at pp. 157–159.)

Unlike in *Arcaro*, here Kaplan *did* have evidence supporting her client's claim. As discussed above, she had testimony from both Harutyunov and Petrosyan supporting the claim. She also had the opinion of an expert witness and documentary evidence supporting the conclusion that the fax line on the Commission Agreement was genuine. And, unlike the signature at issue in *Arcaro,* the signatures of Litinsky and Kent on the Commission Agreement were not forgeries on their face; Litinsky's claim was that the signatures were real but were copied and pasted from another source.[8]

_____

[8] Indeed, the basis for Litinsky's expert opinion that her signatures were fraudulent was apparently that they were *too* similar to the genuine signatures from which they were allegedly copied.

18

Kaplan was not obligated to drop her client's claim simply because her litigation opponent claimed that Kaplan's client was lying. Indeed, to do so might have been inconsistent with her professional obligations. (See *Marijanovic, supra,* 137 Cal.App.4th at p. 1272, fn. 5.)

Litinsky cites Kent's declaration as confirmation from a third party that the Commission Agreement was fraudulent. For purposes of the anti-SLAPP motion, we credit McAfee's testimony that he discussed the *contents* of Kent's declaration with Kaplan in early 2018.

However, Kaplan testified that she did not believe McAfee's representations about the declaration. Kaplan was not required to simply accept McAfee's description of the declaration. Her reticence to do so was supported by McAfee's refusal to provide her with a copy of the declaration. Litinsky acknowledges in her brief that she did not provide that declaration to Kaplan until a week before the July 2, 2018 trial. Kaplan submitted evidence of e-mail correspondence in which McAffee told Kaplan that she should "[d]o your own homework—both for Mr. Ken't's [*sic*] phone number and for any other documents that are work-product protected. . . . I don't want this resolved; I want to go to trial so I can get a perjury finding against your client and a judgment against same that I can proceed with. . . . I felt it was professional courtesy to continue to warn you about your client—you have chosen to ignore the same. I am not required to 'show my hand' before trial just to prove to you what due diligence conducted by you would show you." Moreover, Kaplan testified that, after her conversation with McAfee about the Kent declaration, she located Kent's signature on a bankruptcy filing (which she also filed as

an exhibit to her motion), and that signature appeared to match Kent's signature on the Commission Agreement.

Critically, unlike the collection agency named as a defendant in *Arcaro*, Kaplan is a lawyer who was obligated to represent her client.  The same court that decided *Arcaro* subsequently observed that the collection agency's *attorneys* in that case were not defendants in the malicious prosecution action.  The court explained that "*Arcaro* contains no hint that the attorneys lacked probable cause to file suit based on the facts known to them.  To the contrary, *Arcaro* suggests the attorneys were entitled to rely on the genuineness of Arcaro's signature on the guarantee and had no duty to investigate before filing suit." (*Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 627 (*Swat-Fame*), citing *Arcaro, supra,* 77 Cal.App.4th at pp. 158–159.)[9]

Other cases similarly hold that an attorney may rely upon information supporting a client's claim unless the information is indisputably false.  (See *Morrison, supra,* 103 Cal.App.4th at p. 513 [lawyers could reasonably rely on client's "account of misrepresentation, reliance, and ensuing damages"]; *Marijanovic,*

---

[9] In *Swat-Fame,* the court held that the plaintiff's attorneys were not put on notice of any "specific fatal flaw" in their client's case based on a "boilerplate denial of the facts" by opposing counsel, and they therefore had probable cause to file a lawsuit. (*Swat-Fame, supra,* 101 Cal.App.4th at p. 627.)  The court also held that, if probable cause exists at the inception of a lawsuit, a lawyer cannot be liable for malicious prosecution for continuing to prosecute the lawsuit.  (*Id.* at pp. 627–629.)  That portion of the court's holding was subsequently disapproved in *Zamos v. Stroud* (2004) 32 Cal.4th 958, 973.

*supra*, 137 Cal.App.4th at pp. 1271–1272 [probable cause to pursue indemnification lawsuit against a subcontractor was not negated by the subcontractor's "bald assertion" that the scope of his work was limited]; *Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 453–454 [discovery of mistakes in investigative reports did not negate probable cause to continue the prosecution of a counterfeiting lawsuit where other evidence of counterfeiting remained]; compare *Daniels, supra,* 182 Cal.App.4th at p. 224 [factual dispute existed on the issue of probable cause where it was unclear whether the client personally witnessed alleged defamation and there was an "absence of any witnesses, documents, or other evidence" in support of the client's allegations].)

Finally, Litinsky argues that Kaplan lacked probable cause to prosecute Harutyunov's claim because Kaplan did not adequately investigate the facts underlying the claim after Litinsky denied entering into the Commission Agreement. That argument is inconsistent with the rule that probable cause is analyzed based on the facts known to the defendant, not on the adequacy of an attorney's investigation or research. In *Sheldon Appel,* our Supreme Court explained that once a trial court finds that the filing of a prior action was objectively reasonable based upon the facts known to the malicious prosecution defendant, "the court has necessarily determined that the malicious prosecution plaintiff was not subjected to an unjustified lawsuit. When the court has made such a determination, there is no persuasive reason to allow the plaintiff to go forward with its tort action even if it can show that its adversary's attorney did not perform as thorough an investigation or as complete a legal research job as a reasonable attorney may have conducted."

(*Sheldon Appel, supra,* 47 Cal.3d at p. 883; see *Ecker v. Raging Waters Group, Inc.* (2001) 87 Cal.App.4th 1320, 1331 ["Whether the malicious prosecution defendant conducted a sufficient or adequate investigation is legally irrelevant to the probable cause determination"].)[10]

Based upon the facts she knew, Kaplan had probable cause to prosecute Harutyunov's lawsuit against Litinsky. Litinsky

---

[10] In *Arcaro,* the court stated that "when a party is put on notice a fundamental element of its case is disputed, it should not proceed without evidence sufficient to support a favorable judgment on that element or at least information affording an inference such evidence can be obtained." (*Arcaro, supra,* 77 Cal.App.4th at pp. 158–159.) The statement must be viewed in light of the court's holding. The critical element of the holding in *Arcaro* was that, in light of the information that Arcaro provided about the fraudulent nature of his purported signature on the credit application, without further investigation the plaintiff collection agency did *not* have sufficient evidence that could support a judgment in its favor. Thus, in *Arcaro* the plaintiff simply did not have probable cause to file an action based on the information that it already knew. As discussed above, that is not the case here. We do not understand *Arcaro* to suggest that probable cause may be absent if a plaintiff's lawyer does not perform an adequate investigation whenever an opposing party disputes some element of the plaintiff's claim. Such a reading would be inconsistent with *Sheldon Appel.* (See *Sheldon Appel, supra,* 47 Cal.3d at p. 883.) Our interpretation is also consistent with the court's subsequent explanation in *Swat-Fame* that *Arcaro* presented "unusual circumstances," and that "[n]ormally, the adequacy of a prefiling investigation is not relevant to the determination of probable cause." (*Swat-Fame, supra,* 101 Cal.App.4th at p. 627.)

therefore failed to meet her burden in opposing Kaplan's anti-SLAPP motion to show a probability of success on her malicious prosecution claim.[11]

## 4. The Trial Court's Evidentiary Rulings Do Not Provide a Ground for Reversal

Litinsky argues that the trial court erred in overruling all her objections to Kaplan's declaration. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444.) " 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566, quoting *Loomis v. Loomis* (1960) 181 Cal.App.2d 345, 348–349; see Evid. Code, § 353.)

A miscarriage of justice from the alleged erroneous admission of evidence is found only when "the appellate court, after examining all the evidence, is of the opinion that ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 455, quoting *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Litinsky's brief includes only a lengthy list of her objections to Kaplan's declaration and the claimed reasons why the

---

[11] In light of our decision on this issue, we need not consider Kaplan's additional argument that Litinsky failed to provide sufficient evidence of malice.

identified testimony was inadmissible.  Litinsky does not provide any argument or citations showing that any particular evidentiary ruling was prejudicial.  Other than the conclusory statement that the trial court "clearly weighed and applied" Kaplan's declaration in its ruling, Litinsky does not provide any explanation of why the trial court's ruling would likely have been different in the absence of particular testimony that she claims was inadmissible.  She has therefore failed to identify any grounds for reversal.  (See Evid. Code, § 353.)

Nor do we see any ground to conclude that the trial court abused its discretion in overruling Litinsky's objections.  Many of Litinsky's arguments in support of her objections on appeal simply attack the credibility of Kaplan's statements.  Such arguments go only to the weight of Kaplan's testimony, not its admissibility.

Litinsky's relevance objections to testimony about Kaplan's state of mind were also not well taken.  Kaplan's knowledge of particular facts was relevant to the element of probable cause, and her subjective belief in the merits of Harutyunov's claim was relevant to the element of malice.  (See *Sheldon Appel, supra,* 47 Cal.3d at pp. 880–881.)

The trial court also acted within its discretion in rejecting Litinsky's objections that particular testimony lacked foundation or offered a legal conclusion.  Some of Kaplan's statements were conclusory (e.g., "I had probable cause to file and maintain the Underlying Action on behalf of [Harutyunov]").  However, such statements were in the nature of a summary or introduction to a more specific factual discussion.  Moreover, "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be

24

decided by the trier of fact." (Evid. Code, § 805.) We see no basis for reversal based upon the trial court's evidentiary rulings.

**DISPOSITION**

The trial court's order striking Litinsky's claims against Kaplan is affirmed. Kaplan is entitled to her costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.